## SMITH *et al. v.* YOUNG *et al.*

(Division B.   Feb. 11, 1924.   Suggestions of Error Overruled March 24, 1924.)

[99 So. 370.   No. 23543.]

1. WILLS. *Witness must be satisfied with maker's testamentary capacity.*

   The attesting witnesses to a will must not only witness the signing and publishing of it by the testator, but it is also their duty to satisfy themselves that testator is of sound and disposing mind and memory, and capable of executing a will.

2. WILLS. *Testimony of subscribing witnesses best evidence of execution.*

   The testimony of the two subscribing witnesses to a will is the best evidence of its execution.

3. WILLS. *Prima-facie case made out when will offered for probate and execution proved by two subscribing witnesses; after making out prima-facie case, proponents of will may either rest, or introduce further testimony.*

   In a contested will case, where the will is offered for probate in solemn form, proponents make out a *prima-facie* case by proving the signing and publishing of the will by the testator, and that they signed as attesting witnesses in his presence and in the presence of each other. Proponents may then rest their case, or introduce other testimony relating to the issue.

4. WILLS. *Court may permit additional evidence of proponents after testimony of contestants, though not strictly rebuttal.*

   Where proponents not only introduced the subscribing witnesses to prove due execution of the will, but also other witnesses on the issue submitted to the jury, and after the contestants have introduced their testimony, the court may, in its discretion, in the interest of justice, permit proponents to introduce other testimony sustaining their contentions, though it be not strictly rebuttal testimony.

5. WILLS. *Evidence held to sustain genuineness of will.*

   In this case the facts are examined and a vast preponderance of the testimony *held* to support the finding of the jury in favor of proponents of will.

APPEAL from chancery court of Clay county.

HON. A. J. McINTYRE, Chancellor.

Proceeding between Sanford Smith and others and Sanford Young and others. From the decree rendered, the former appeal. Affirmed.

*W. W. Magruder, Sayles & Sayles,* and *J. E. Caradine,* for appellants.

The alleged will is a typewritten document, consisting of two sheets of paper and a binder or jacket. The first sheet is the alleged will itself, and the second sheet is the attestation clause thereto, signed by Gates T. Ivy, attorney for proponents, and Miss Carrie Hoover Malone, who was at that time his stenographer.

Appellants with regret and sorrow but without hesitation charge that the alleged will is a forgery perpetrated by such attesting witnesses or through their procurement, or to be even more specific through procurement of proponents' attorney who claims to have drafted and dictated the will.

As the eminent experts who testified in this case for appellants indicated in their testimony and in certain communications with the writer of this brief, we have in the instant case a problem as definite and tangible as the identification of a horse or an automobile from marks and scars and bumps and dents. We are not obliged to depend upon the opinion of any expert or other witness except in so far as those opinions are supported by cogent reasons that appeal to us as men of sense and reason.

More and more the various supreme courts of the various states are coming to look upon testimony relating to a tangible thing like a document not as the basis for a mere opinion, but as a problem that appeals to the intelligence of the observer. In the argument of this case, upon the law and upon the application of the facts herein to the law thereof, we address ourselves to the reason and to the conscience of this court. We make no appeal to pas-

sion or to prejudice but we talk to your heads and your hearts.

The supreme court of our neighboring state, Florida, has discused this question in the recent case of *Boyd* v. *Gosser*, 82 So. 758, and the gist of that discussion is that testimony of this kind is an appeal not to the credulity of the hearer or observer but to his intelligence. In that case, the supreme court of Florida reversed a jury verdict for the specific reason that expert testimony of this kind was not given its conclusive value. This is the trend of modern authority and precedent on this subject and eventually will be the universal rule because it is a rule based upon common sense and common reason. Forty witnesses may testify that the law of gravity does not control physical matter in this universe and a credulous jury might return a verdict accordingly; but it would not be binding upon an intelligent court. No judge of this tribunal or any other tribunal under such circumstances could afford to stultify himself by saying, "The court is bound by the verdict of the jury in this case on conflicting evidence."

That is not the instant case. There is no conflicting evidence. The testimony of the alleged attesting witnesses and of those other witnesses who undertook to support them is of negligible value. It does not rise to the dignity of evidence. It is demolished and destroyed by physical facts as certain as that God rules and reigns in Heaven. The supreme court of Kansas in *Baird* v. *Shaffer*, 168 Pac. 836, adopts the same view in cases of this nature and the supreme court of Nebraska in *O'Conner's Estate*, 179 N. W. 401, takes the same position on the side of reason and sense. The supreme court of New York in *Venuto* v. *Lizzo*, 130 New York Supplement, 1066, in referring to testimony of this nature says, "that if supported by sufficiently cogent reasons, it may amount to almost a demonstration."

This is our contention in the instant case, that it does amount to a mathematical demonstration. All that we

ask of this court in so far as the facts of this case are concerned is that scrutiny and analysis of the original exhibits, photographs, and other testimony in this case which is so well justified by the importance of the principles involved. Under the magnifying glasses, this court will be able with little difficulty to detect the patching, the pointing, the careful efforts, not at legibility but at simulation that characterize this signature. This court will inevitably be drawn to the same conclusion reached by Expert Witness Wood that this alleged signature is spurious in itself and of itself, entirely independent of comparison with other signatures.

It is claimed by proponents in this case that both pages of this alleged will are the work of a No. 10 Remington typewriter. It is claimed by the contestants that the two pages of the will in controversy are the work of different typewriters, to-wit: that the first page was written on an Underwood typewriter, and that the second page was written on a No. 10 Remington typewriter,—the particular No. 10 Remington typewriter in Mr. Ivy's office. If this latter claim is true, it should not be at all difficult to ascertain and establish it with the utmost certainty; for each of these machines carry certain characters which make its work, beyond all possible question, individual and distinctive.

As conclusively demonstrated in our statement of facts, the alleged will in this case is manifestly spurious for two reasons. 1st: Because H. H. Young did not sign it; 2d: Because the first page here propounded for probate was not written on a Remington typewriter, proponents demanding probate of an instrument so written.

Mr. Osborn in "Questioned Documents," 135-136, explains in lucid language the characteristics of a simulated signature or in other words, a forged signature by processes of imitation. Mr. Osborn also in "The Problem of Proof," 384-385, explains the customary evidences of a spurious signature.

The same authority in the same book at page 485 quotes

with approval certain extracts from the jury instructions delivered by Mr. Justice WILLIAM J. GAYNOR of New York in the case of *Redmonds* v. *Manning, et al.* Mr. Osborn in "Questioned Documents," 437-438, discusses the use of the typewriter in the preparation of spurious documents. This author in "Questioned Documents," 444-448, explains the differentiation of type forms between different machines.

Typewriting individuality in many cases is of the most positive and convincing character and reaches a degree of certainty which may almost be described as absolute proof. The identification of a typewritten document in many cases is exactly parallel to the identification of an individual who precisely answers a general description as to features, complexion, size, etc., and in addition matches a long detailed list of scars, birth marks, deformities and individual peculiarities.

As a means of identifying the particular machine upon which a writing was done or determing its date the examination of the type in question should be made in five ways: First, the design, size and proportions of all the characters. Second, the relation of the character as printed to adjacent characters or the vertical and horizontal alignment. Third, the vertical position of the character in relation to the line of writing—that is, its perpendicularity or slant to the left or right. Fourth, the comparative weight of impression of the upper, lower, right or left sides of each character, or, as the machine adjusters describe it, how the type stands "on its feet." Fifth, the condition of the type faces and the presence of defects, bruises, or "scars" in the letters due to wear or to accidents.

The court will read with pleasure and profit this entire chapter on questioned typewriting which appears in Mr. Osborn's valuable book, "The Problem of Proof" as chapter 25. The court in the instant case is confronted with this proposition, whether it shall accept and approve the verdict of the jury, declining to assume its judicial

responsibility, or whether it shall accept and approve the verdict of reason, it being evident that there is in this case no such conflict of testimony as to justify the verdict rendered by the jury in the trial court.

Mr. Osborn in the same book, pages 268-269, explains the feasibility of discovering, that a disputed document was not written on the date that it bears by progressive changes upon the machine that wrote such document. See too Ames on Forgery, page 117.

The testimony of attesting witnesses in a will may be overcome by any competent evidence. *Ginter* v. *Ginter,* 79 Kan. 721, 738, 23 L. R. A. (N. S.) 1024, syl. sec. 5, 101 Pac. 634; 2 Wigmore, Ev., secs. 886, 1514. Such evidence may be direct, or it may be circumstantial; and expert and opinion evidence is just as competent as any other evidence. Indeed, where the signature to a will is a forgery, and where the attesting witnesses have the hardihood to commit perjury, it is difficult to see how the bogus will can be overthrown except by expert and competent opinion evidence tending to show that the pretended signature is not that of the testator, but spurious. The rule contended for by appellants would frequently baffle justice and give judicial countenance to many a high handed fraud. 3 Wigmore, Ev., section 2014; *McKay* v. *Laster,* 121 N. Y. 477, 24 N. E. 711

In *Boyd* v. *Gosser,* (Fla.), 82 So. 758, 6 A. L. R. 500, we have a case of great value in the consideration of the case now before the court for its decision. The opinion in *Boyd* v. *Gosser,* calls attention to the distinction between what is termed "moral evidence" and "physical facts." In the case at bar, the record contains both moral evidence and demonstrative evidence.

The moral evidence of the lay witnesses testifying as to their belief or opinion of the genuineness of the signature of H. H. Young to the purported will is intrinsically weak and in fact valueless. The demonstrative evidence offered by the contestants is "evidence of the highest

rank," and conclusive that both the typewriting and the signature to the alleged will were forged.

In Boyd v. Gosser, and also in *Bane* v. *Gwyn*, 7 Idaho, 439, 63 Pacific, 634, our courts emphasize the reason for declining to accept the decision of the trial court, either judge or jury, on the facts in cases involving disputed documents which document or documents and the standards for comparison are before the supreme court, and they will have the same identical opportunity as was enjoyed by the original triers of the facts to ascertain the truth.

The United States supreme court recognizes this principle in *Luco* v. *United States*, 16 Law Edition, 545, comparing and contrasting the original exhibits in the trial court exactly as this court can do and being thereby enabled to reach for itself the definite conclusion that the disputed instrument was a forgery just exactly as this court will be able to reach under similar circumstances the same conclusion.   See also *Richardson* v. *Green*, 61 Federal, 423; *Wilson-Ward Company* v. *Farmers Union Gin Company*, 126 S. W. 847; *Metz* v. *Brodfreshrer* (1918), 282 Ill. 626, 118 N. E. 1048; *Drysdales Succession* (1911), 127 La. 90, 54 So. 138; *Re Walker's Succession* (1918), 142 La. 955, 77 So. 889; *Day* v. *Cale*, 31 N. W. 823; *Silver* v. *Elias* (1901), 34 Misc. 760, 68 N. Y. Supp. 851; *Heapy* v. *Metropolitan L. Ins. Co.* (1908), 25 App. Div. 420, 49 N. Y. Supp. 466; *Townsend* v. *Perry* (1911), 146 App. Div. 225, 130 N. Y. Supp. 951; On subsequent appeal (1917), App. Div. 415, 164 N. Y. Supp. 441; *Young's Estate* (1911), 59 Or. 348, 116 Pac. 95, Ann. Cas. 1913 B. 1310; *McIlhenny* v. *Trinkle*, 217 Pac. 179; *United States* v. *Sixty Barrels of Wine*, 225 Federal, 846; *Brooks* v. *Tichbourn*, 14 Jur. 1122, cited in *Stitsel* v. *Miller*.

In *Gillis* v. *Smith*, 114 Miss. 665, this court through Justice STEVENS makes the following announcement: "This court always proceeds slowly in reversing a chancellor on the facts.   But the Constitution invests us with appellate equity jurisdiction, and, in reviewing this

record, we do so as chancellors, charged with the solemn duty of requiring the proof to measure up to legal standards. If, according to our view of the facts and the promptings of our conscience, the learned Chancellor was manifestly wrong, then it becomes our plain duty to set aside the decree of the court below and apply the legal test as we see it.

The issue of fact in *Hand* v. *Cottrell*, 100 Miss. 42, was clear and sharp. This court undertook to weigh and analyze the testimony upon which such result was reached, upon which analysis, the decision of Chancellor ROBINS was reversed and final judgment entered for appellant. See, also, *Lee* v. *Wilkinson*, 105 Miss., 358.

II. Appellants, upon the conclusion of appellees' direct testimony, introduced three witnesses, Frank A. Critz, Dr. Louis Schulhoefer and Jay Fordyce Wood of Chicago. In every case decided by this court, where the proper procedure was an issue therein, this was the conclusion of the trial in so far as testimony was concerned, under the record.

Appellees had undertaken to establish by six witnesses that H. H. Young signed the alleged will on the 9th day of July, 1918, or at least, they had undertaken to establish that fact by two witnesses and to establish the identity and genuine character of such signature by four witnesses. However, upon the conclusion of appellants' testimony, appellees were permitted by the court over appellants' objection to reopen their case in effect and to introduce evidence that the disputed signature of H. H. Young was genuine. These supposed or so-called rebuttal witnesses were as follows: E. McCloskey, Gus V. R. Meechin, John W. Sparkman, Ed. Hamlin, Miss Tine Gates, H. J. Kornegay, C. D. Bouchillon, and L. J. Howard. Under the facts and circumstances of this case, McCloskey, Meechin, Sparkman, Kornegay and Bouchillon were direct witnesses, undertaking to establish the disputed signature of H. H. Young as a genuine signature. That was the sole and only purpose of their testimony.

The testimony of these witnesses was not admitted by the court on any theory that such witnesses had been overlooked or that he in his discretion would permit appellees to introduce such evidence although not in rebuttal; but it was admitted as the court's ruling distinctly specifies because it was held by the court to be rebuttal testimony and to be introduced in its proper place. No well-considered case can be found from this court or from any other court authorizing such procedure. The leading case in this state on this proposition in *Sheehan* v. *Kearney,* 82 Miss. 688. See section 1665, Hemingway's Code. *Gathings* v. *Howard,* 122 Miss. 355, certainly affords no precedent for such irregular procedure.

*The admission of the alleged carbon copy of the alleged will was serious and prejudicial error against appellants in this case.*

Wigmore on Evidence, sections 1231-1234, undertakes to distinguish between copies of documents and duplicates of documents. In *International Harvester Company* v. *Elfstron* (Minn.), 118 A. S. R. 626, the court held that different impressions or carbon copies of a document, so-called, are in fact duplicate originals and that either or any of same may be introduced without accounting for the others.

This court will also find in 19 Corpus Juris, 836, a more or less involved discussion of the distinction between copies and duplicates. However, the sole purpose in all of these authorities and precedents is to determine the competency and value of copies or duplicates as secondary evidence. We have no such case here. The trial court was not confronted with any proposition of a lost will or other lost document. It was neither a question of "copy" nor "duplicate." It was an effort pure and simple on the part of proponents to bolster up their case by producing and presenting a document alleged to be a carbon copy or a duplicate of the alleged will. Certainly, nobody questioned that. It is just as easy to take a carbon impression of a forged document as of a genuine document.

Counsel for appellants take no pleasure in the presentation of this case to this tribunal. We submit our brief with regret and sorrow but without the slightest degree of hesitation because it is a lawyer's inexorable duty under his oath of office as a lawyer and because honor and justice demand it. On the law, independent of its facts, this case should be reversed, and upon those facts, independent of all other assignments of legal error, final judgment should be entered for appellants.

*Wells, Stevens & Jones, W. G. Roberds,* and *Gates T. Ivy* for appellee.

*The best evidence as to the due execution of the will in accordance with the requirements of our statute is that of the attesting witnesses.* We premise our remarks on this point by a statement of what we believe to be the true rule, to-wit: "A *prima-facie* case of due execution of a will is made out by introducing the evidence of the witnesses to the will, and putting the will in evidence." 40 Cyc. 1284. *Brock* v. *Luckett,* 4 Howard 459; *Gillis* v. *Smith,* 114 Miss. 665; *Helm* v. *Sheeks,* 116 Miss. 725; *Gathings* v. *Howard,* 122 Miss. 355, 84 So. 240; *Moor* v. *Parks,* 122 Miss. 301, 84 So. 230; *Isom* v. *Canedy,* 88 So. (Miss.) 485.

In the case at bar every requirement of the statute was complied with. The document itself was produced, was considered by the jury and upheld. It bore the signature of the testator. It had the proper attestation clause. It had the genuine signatures of the two subscribing witnesses. The introduction of the document, supported by the testimony of subscribing witnesses, therefore established a *prima-facie* case, and the evidence of the subscribing witnesses is the best evidence. It was so regarded by the jury. It is so regarded by all the adjudications. *Stevens* v. *Vancleve,* 4 Wash. C. C. 262.

The opinion of an expert is entitled to little weight as against the evidence of the attesting witnesses. *Kelly* v. *Perrault* (Idaho), 48 Pac. 45; 3 Alexander on Wills, pars. 1302, 1307, 1308, 511; *In re Lillibridge's Estate,* 221 Pa.

St. 5, 128 Am. St. Rep. 723, 69 Atl. 1121.; Lawson on Expert and Opinion Evidence (2 Ed.), 327; *Wilson* v. *Kelling* (Ky.), 50 S. W. 539; Schouler on Wills (5 Ed.), par. 348; *Neiheisel* v. *Toerge,* 4 Redf. (N. Y.) 328; *Gable* v. *Rauch* (S. C.), 27 S. E. 555; *Harp* v. *Parr,* 168 Ill. 459; *Brown* v. *Mutual Benefit Life Insurance Company,* 32 N. J. Eq. 809; 1 Underhill on Wills, footnotes. 234; *Wright* v. *Flynn,* 69 N. J. Eq. 753; *Bank* v. *Wright,* 184 Mo. App. 164; *Will of Lawrence Convey, Deceased,* 52 Iowa 197, 2 N. W. 1084.

So say we in the case at bar, that the testimony of Gates T. Ivy and Miss Malone—"is of far greater value than the opinion of witnesses that the signature is not genuine." There is not the slightest testimony indicating the impeachment of Miss Malone, and the only semblance of a motive which could animate Gates T. Ivy is the fact that he appeared as an attorney in this case on a contingent fee. The jury believed both witnesses and both stand before this court unimpeached.

## II.

*In the trial of an issue devisavit vel non the proponents, after making out a prima-facie case, can rest.* 40 *Cyc.* 1284.

In the West Virginia case of *Kerr* v. *Lunsford,* 2 L. R. A. 271, the court said—"In the trial of an issue *devisavit vel non,* it is the proper course to pursue for the proponents to offer the will and the evidence of its due execution, and the competency of the testator at the time it was executed, and then, having made a *prima-facie* case, to rest; and after the contestants have offered their evidence against the validity of the will, to permit the proponents to offer other evidence to sustain the will, as well as evidence in rebuttal of the evidence of the contestants." See, also, *Seebrook* v. *Fedawa* (Neb.), 46 N. W, 650; *Jamison* v. *Jamison,* 96 Miss. 297.

Our statute makes the record of the probate of a will in common form *prima-facie* evidence of the due execu-

tion of the will in a subsequent contest between the pro-
ponents and the contestants. Now in a case of contest
after probate in common form the record of the probate
makes out a *prima-facie* case for the proponents. This
is a statutory or legal presumption. It is purely a pre-
sumption of evidence made so by the law itself. But we
submit that it was never the intention of the law to re-
quire a higher degree of proof in a contest where a *caveat*
is filed and there is no probate in common form, than
is required preliminarily of the proponents in establish-
ing the will for probate in common form. Without the
probate in common form the proponents simply intro-
duce the will and the evidence of the subscribing wit-
nesses, and make proof of all of the requisite solemnities
required by our statute. The *caveat* simply gives the con-
testants the right to be heard in the first instance. *Shee-
han* v. *Kearney,* 82 Miss. 688; *Gathings* v. *Howard,* 122
Miss. 355, 84 So. 240.

It is familiar learning that an instrument of writing,
properly identified and proven, and introduced in evi-
dence, speaks for itself. The attesting witnesses estab-
lished a will just as the payee or holder of a promissory
note establishes the note, or the grantee establishes a
deed. It is true that the requirements of our statute au-
thorizing the making of a will must be complied with, and
this necessitates some proof of mental capacity in estab-
lishing a will. But when the mental capacity of a testator
is established by the subscribing witnesses, who also
vouch for the due execution of the instrument, a *prima-
facie* case is made out. It is then up to the contestants to
raise a definite issue by relevant testimony, whether that
issue be mental incapacity, undue influence, or forgery.
So it is that in the case at bar the proponents went fur-
ther than they were required to do in offering the testi-
mony of Cotrell and Yates to prove that the signature of
H. H. Young to the will was genuine. These witnesses
might well have been reserved for rebutting testimony
after the contestants offered testimony tending to prove

that the signature was spurious. *Walton* v. *Kendrick* (Mo.), 25 L. R. A. 701; *Moore, et al.,* v. *Parks,* et al., 122 Miss. 301, 84 So. 230.

### III.

*Expert testimony is always intrinsically weak and unsatisfactory.* Taylor on Evidence; *Winans* v. *N. Y., etc., Railroad Company,* 21 Howard 101; *State* v. *Watson,* 65 Maine, 74; *Tracy Peerage,* 10 Cl. and Fin. 154, 191, per Lord CAMPBELL; *Cowan* v. *Beall,* 1 *McArthur,* 270, 274; *Wright* v. *Williams' Estate,* 47 Vt. 222, 234; *Pratt* v. *Rawson,* 40 Vt. 183, 188; GRIER, J., in *U. S., Darnaud,* 3 Wall, Jr. 143, 183; GRIER, J., in *Turner* v. *Hand,* 3 Wallace Jr., 88, 115; *State* v. *Ryno* (Kansas), 64 L. R. A. 303, 317, and note.

Turning now to some expressions from our own court, we direct attention to *Wilson* v. *Beachamp,* 50 Miss. 24; *Moye* v. *Herndon,* 30 Miss. 110; *Roy* v. *First National Bank of Aberdeen,* 33 So. 411, and especially to the suggestion of error, 33 So. 494; Rogers on Expert Testimony, par. 129.

### IV.

*The verdict of a jury on conflicting testimony is usually accepted by an appellate court as conclusive on the facts.* *Watson* v. *Dickens,* 12 S. & M. 608, per Justice CLAYTON; *Vicksburg Bank* v. *Moss,* 63 Miss. 74; *Y. & M. V. Railroad Company* v. *Williams,* 67 Miss. 18; *Kansas City R. R. Company* v. *Cantrell,* 70 Miss. 329. The rule was restated and enforced in *Kemp* v. *Turman,* 104 Miss. 501; *Estes* v. *Jones,* 119 Miss. 142; *Fraternal Aid Union* v. *Whitehead,* 87 So. 453; *Mobile & Ohio Railroad Company* v. *Campbell,* 75 So. 354. See, also, *King* v. *Rowan,* 82 Miss. 18.

### V.

*There was no error in overruling the challenge for cause to the juror Rose.* Appellants had a fair and im-

partial jury.  It appears that the only basis for the objection to this juror was in the fact that Mr. Rose and Dr. Price Ivy "married sisters."  The juror had no knowledge of the facts and no opinion.  He had not prejudged the case in any wise.  He was not related to any of the litigants on either side.  He was not related even to Gates T. Ivy, of counsel for the proponents.

Furthermore appellants challenged this juror peremptorily and a competent juror was put in his place.  The record says:  "Whereupon another man was placed in the box and a jury of twelve good and lawful men of the United States were impaneled and the case proceeded as follows."  Our first answer to counsel's contention is that the juror Rose was competent.  Our next answer is that so long as appellants had a fair and impartial jury there is no reversible error.  This is a rule enforced even in criminal cases where life and liberty are more precious than property rights.  16 R. C. L., par. 106; *Ferriday* v. *Selser*, 4 Howard 506; *Ogle* v. *State*, 33 Miss. 383; *Simmons* v. *State*, 109 Miss. 605; *Barnett* v. *Dalton*, 69 Miss. 611.

## VI.

*There was no error in admitting rebuttal testimony.*  Even if the order of introducing evidence is not the usual one, still the matter of introduction of testimony was within the discretion of the trial court.  We have already argued that the order of the testimony was proper and legal, citing authorities, including the very strong case of *Kerr* v. *Lunsford*, 2 L. R. A. 671, as well as Mississippi cases.  See, also, *Costello* v. *Crowell*, 133 Mass. 353; *Steinkuehler* v. *Wempner*, 15 L. R. A. (N. S.) at page 674; 40 Cyc. 1330; 38 Cyc. 1343; 4 Wigmore on Evidence, 9, par. 1867; 38 Cyc. 1353, 1354, 1356, 1357 and 1359; *French* v. *Railroad Company*, 74 Miss. 542.

In the case at bar there was really nothing to put the proponents on notice of just what the defendants intended to prove, or would undertake to prove.  The an-

swer and cross-bill did not directly charge a forgery. It certainly did not indicate on its face that there would be an effort to hold Gates T. Ivy responsible for forgery. No time, or place, or circumstances were indicated by the pleadings. It is only when the expert, Wood, took the witness stand and advanced his theories that the line of the attack on the will was made known to the proponents. It was perfectly natural and proper for the proponents to meet this line of attack by showing that it was impossible to have forged this will in Oklahoma, or at the time and place indicated. The rebuttal testimony also contradicted the position and theory of the experts that the will was not genuine.

## VII.

*There was no error in refusing to hold the case open until the arrival of Expert Osborn from New York.* There was no reason why he could not have been obtained before. Contestants admit that they did not know what he was going to testify to. Whatever his testimony might be it would be cumulative. It is needless for us to cite authorites to this court that even newly discovered evidence would not justify a new trial where that evidence would be merely cumulative. Even if Osborn had been presented and testified, his testimony would have been merely the opinion of a professional, paid expert, put against the positive testimony of witnesses who speak from actual knowledge of the facts, and it is inconceivable that his full testimony would have changed in any wise the righteous result which has been reached. *Graves* v. *Miss. etc., R. Company,* 6 Howard 548; *Davis* v. *Black,* 5 S. & M. 226; *Louisiana, etc. R. Company* v. *Crayton,* 69 Miss. 152; *DeMarco* v. *State,* 59 Miss. 355; *Vanderberg* v. *Campbell,* 64 Miss. 89; *Ellis* v. *Kelly,* 33 Miss. 695; *Moore* v. *Railroad Company,* 59 Miss. 243; *Ennis* v. *Yazoo & M. V. Railroad Company,* 118 Miss. 509.

## VIII.

*There was no error in overruling the motion for a new trial, based upon so-called newly discovered evidence.*

No proper showing was made as to why the Remington typewriter agent at Memphis could not have been produced during the progress of this long trial, and his testimony taken as to the Remington machine in the possession of Mr. Ivy. Furthermore Mr. Ivy was not questioned about the purchase of this machine, and there was no proper predicate laid for contradicting him on this subject. There are abundant authorities upholding wills where the subscribing witnesses were not able to recollect the details and circumstances surrounding the execution, and where it would be absolutely impossible for the witnesses to recall what kind of a typewriten was employed. A case illustrating this rule will be found reported as one of the leading L. R. A. cases, *Mead* v. *Trustees of Presbyterian Church of U. S. A.* (Ill.), 14 L. R. A. (N. S.) 255.

*J. E. Caradine, Sayles & Sayles,* and *W. W. Magruder,* for appellants in reply.

Appellees' briefs in this case, which is so simple and certain, comprise in the aggregate 410 pages. It it took three lawyers six weeks to prepare those three briefs, covering 410 pages, it would take one lawyer eighteen week to undertake any complete and comprehensive reply to same.

REPORTER'S NOTE: However it would take at least one hundred pages of this volume to do justice to counsel's elaborate analysis of this case on the facts.

Argued orally by *W. W. Magruder* for appellants and *J. Morgan Stevens* and *W. G. Roberds* for appellees.

SYKES, P. J., delivered the opinion of the court.

This case is a contest over the alleged will of H. H.

Young, who was a citizen of Clay county. Young was a bachelor. A short time after his death, no will having been found, letters of administration were taken out upon his estate. Relatively speaking, Young was a wealthy man, and the estate in litigation is a large one.

Young died on December 5, 1921. For a number of years shortly prior to his death Gates T. Ivy, of West Point, Miss., had been his attorney. Hearing the general talk in the community that no will of Young had been found, Ivy stated to several people that some years before Young had executed a will in his office, and that he thought there was a carbon copy of it somewhere among his files. He and his stenographer, Miss Gates, instituted a search for the carbon copy, and an alleged copy was found by Miss Gates. This copy was shown, among others, to Mr. W. G. Roberds, attorney for the administrator of the estate. A few days thereafter, namely, on December 30, 1921, these appellees, as beneficiaries under the will exhibited their petition in the chancery court, with a copy of this alleged carbon copy, praying to establish this lost will. One or two unimportant amendments were made to this petition.

Contestants (appellants in this court) in their answer denied the material allegations of the petition, denied that Young left a will, denied the execution by him of a will of which this was a copy, and further alleged that, even though he had made such a will, during his lifetime he had destroyed it (*animo revocandi*).

On April 14, 1922, the petitioners, with permission of court, exhibited their amended petition, in which they alleged that the original will of H. H. Young had been found, reiterating, in substance, the averments of the original petition, alleging the due execution and attestation of this original will, and asked that it be probated in solemn form. The answer of contestants in substance denied the signing, execution, and attestion of the alleged will. In short, it denied that it was the last genuine will and testament of H. H. Young. An issue of

*dcvisavit vel non* was duly made by the court and sub-
mitted to the jury. This issue presents the single ques-
tion as has been decided by this court in the case of
*Sheehan* v. *Kearney,* 82 Miss. 688, 21 So. 41, 35 L. R. A.
102, and all other contested will cases of this nature,
and that issue is, "Will or no will."

The burden of proof to establish the validity is upon
the proponents of the alleged will.

The will is short. The will and attestation clause are
upon two separate pages of paper, both typewritten. The
al'eged signature of H. H. Young appears in ink near the
bottom of the first page. On the second page the attest-
ing witnesses are Gates T. Ivy and Carrie Hoover Ma-
lone. Their signatures are also written in ink under the
attestation clause.

The jury returned a verdict in favor of the propo-
nents, thereby holding that the will exhibited for probate
was the last genuine will of H. H. Young, properly signed
and executed by him, and properly attested in accordance
with our statutes. Thereupon the chancellor entered a
decree in accordance with the verdict of the jury, and
further construed the will holding that there was a lapsed
legacy, which it is unnecessary for us to discuss inasmuch
as that question of law was properly decided by the chan-
cellor. From which decree this appeal is prosecuted.

While there are a number of assignments of error
argued, the principal one is that the verdict of the jury
is contrary to the testimony; that the testimony demon-
strates that the alleged signature of H. H. Young to the
alleged will is a forgery, and that the decree should be
reversed, and a decree entered in this court to this ef-
fect. We shall therefore discuss this assignment of er-
ror first, which necessarily brings into review the testi-
mony introduced in the trial before the jury.

The proponents first placed upon the stand Gates T.
Ivy. In substance he testified that he had been in the
active practice of law at West Point, Miss., since 1899;
that he had known the deceased, H. H. Young, since he

(Ivy) was thirteen or fourteen years old; that Young was a bachelor at the time of his death; that he was Young's attorney for a number of years, beginning possibly in 1914 or 1915, and so represented him until a short time before his death; that Young was a frequent caller at his office; that Young lent a good deal of money in Clay county, and owned extensive property; that Young personally looked after his affairs; that on July 9, 1918, Young was of sound and disposing mind and memory, and executed the alleged will in question; that he (Ivy), at the instance and request of Young, dictated this will to his stenographer, Miss Malone, while he and Young were seated in the library roof of his office; that Miss Malone then retired to the stenographer's room, and a short time thereafter returned with the will typewritten, whereupon Mr. Young, in the presence of Ivy and Miss Malone, signed the will, and they, in the presence of Young, and in the presence of each other, signed the attestation clause. The will in question was identified by Ivy as the will executed and signed in his office by Young. Ivy testified that he was to receive a contingent fee as attorney in the case in the event the will was probated in solemn form. The court would not permit the contestants to prove what this fee was to be.

Miss Carrie Hoover Malone, the next witness introduced by the proponents, testified that at the time the alleged will was written and executed she was working in the law office of Gates T. Ivy as stenographer. She fully corroborated in every detail the testimony of Ivy about the preparation, signing, execution, and attesting of the alleged will, and testified that the one offered for probate was the one signed and executed in the office of Ivy on the day in question. Shortly thereafter she left the employment of Ivy. She testified that the will was typewritten on a Remington typewriter, she did not recall any other machine being in the office at the time the will was written; that both typewritten pages were written on the same machine. She failed to identify as

the machine on which the will was written a Remington No. 10 typewriter introduced by contestants upon which typewriting was made in the presence of the jury. She stated that she did not think that was the machine upon which the will was written, because her recollection was that the machine had red tabulator stops, and the keys on the front were red. This was different from the Remington No. 10. This witness was in no wise interested in the result of the issue.

L. J. Howard, chancery clerk of Clay county for fifteen years, testified that he was familiar with the signature of Young; had seen him write his signature frequently in satisfying deeds of trust; that he knew Young's signature; that the signature on the will was the genuine signature of Young. He then identified a great number of signatures of Young appearing on the deed of trust records of Clay county.

A. B. Cotrell, assistant cashier of the First National Bank, knew the deceased, Young, during his lifetime, was familiar with his signature, and identified that on the will as the genuine signature of deceased. He then testified about Young doing a banking business with him, and identified a number of checks containing the genuine signature of Young. On cross-examination this witness stated that he recognized the signature of Young just as he recognized the face of counsel for the contestants; that the face would be impressed upon his mind, though he could not tell whether or not an eyelash was crooked or whether counsel's ears were sitting just right or not.

Another banker, L. W. Yates, knew deceased during his lifetime, was familiar with his signature, and identified the one on the will as the genuine signature of Young.

Whereupon proponents rested.

The first witness introduced by contestants was Frank A. Critz an attorney of West Point. Critz identified a note payable to Young receipted by Young. Young's signature appeared thereon, which Critz testified was a genuine signature of Young, and this signature is ad-

mitted by all to be a genuine signature of deceased. He did not know in whose possession the note had been since it was paid.

Dr. Lewis Schulhoeffer, the next witness for contestants, was from Birmingham, Ala. The doctor qualified as an expert in matters of signature and on handwriting. He testified that he had examined fifty or sixty signatures purporting to be that of Young with a microscope; that the signature appearing on the will is a spurious signature; that it is almost identical with the genuine signature on the Critz note. He then goes somewhat into detail as to why he thinks the signature spurious. We shall not set out in full this testimony.

In most of Young's signatures, instead of making periods between the two capital H's, his initials, he makes a short line. This appears on the signature to the will. This witness testified that the appearance of these two lines indicated that they had been gone over. He then pointed out certain differences that he saw indicating pen lifts on the will signature. He testified that the appearance of the will signature indicated that it was written more closely and with more consciousness than the genuine signature was written. In short, he details many alleged differences appearing to him between this signature and other admitted genuine signatures of Young. He further testified that be came to the conclusion that this was a spurious signature from an examination of a photograph of it without any comparison whatever with any admitted genuine signatures. The witness thought that the forger was attempting as nearly as possible to imitate the signature on the Critz note.

J. F. Wood, of Chicago, Ill., was the next witness introduced by the contestants. He qualified as an expert on handwriting, signatures, and typewriting. He was the principal witness introduced by contestants, and it is really upon his testimony that contestants ask that the cause be reversed. They claim that his testimony demonstrates that the signature is a forgery. This witness

took a great many pictures of the signature on the will enlarged many times, and appearing with various density. He states that upon his examination of the signature alone under a microscope he was satisfied that it was a forgery; that the signature itself bears upon its face unmistakable evidence that it is forged. Before examining the signature on the will, however, he had examined several admitted genuine signatures of Young. This witness also thinks the signature on the will more like that on the Critz note than those appearing on the deed records of the county. He testified that there are two kinds of forgeries, traced and simulated. The traced signature is one where the blank paper is placed over the signature to be traced with sufficient light for the signature to appear on the blank paper. Whereupon the signature is exactly traced. This would, of course, make the two signatures practically alike and exactly the same size. A simulated signature is where the forger merely writes the name as much like the genuine signature as he can. He states that the signature on the will is simulated, not traced. He also testified about pen lifts, painting over of different parts of the signature, and certain differences that indicate to him the conscious knowledge of one attempting to simulate another's signature.

The witness further testified that the first page of the will was written on an Underwood typewriter, while the second page was written on a Remington typewriter No. 10, which was exhibited before the jury in the trial of this cause, which typewriter is the property of Gates T. Ivy. In his opinion the Underwood typewriter upon which the first page of the alleged will was written is the same machine upon which Gates T. Ivy on March 15, 1922, from Covington, Okla., wrote a letter to W. W. Magruder, attorney for the contestants. This opinion is based upon the similarity of certain defects appearing in the same typewritten letters and the general appearance of letters as to their cleanliness. Various photo-

graphs of this letter and of the first and second pages of the will were introduced in testimony for the benefit of the jury, and are now before this court as original exhibits. Many of these are enlarged many times to accentuate or make more apparent these alleged differences. Counsel for contestants earnestly insist that this testimony demonstrates this proposition, namely, that the Ivy letter and the first page of the will were both written on the same Underwood typewriter, and that the second page of the will was written on a Remington No. 10.

The witness Wood testified that the letters on an Underwood typewriter and a Remington typewriter are differently made; consequently there is a difference in their formation, and this difference readily appears from an examination; that the serifs on an Underwood are much longer; that the small "f's" and a's" are different from those on a Remington, and that there is a slight difference in the size of the letters; also that the formation of the small "y's" on the two typewriters is different, particularly in the curve of the tail of the "y" and the little ball with which it ends. There are enlarged photographs in the record where all the letters are placed in the position to illustrate this contention. He testified that, while ordinarily a Remington typewriter did not have an asterisk made on it, yet they were put there at special request; that an Underwood always has an asterisk; that there is a difference between the Remington and the Underwood asterisks; that the asterisk appearing on the first page of the will is that of an Underwood. Another alleged difference pointed out by this witness is that on the first page of the will the small "a's" were always in proper alinement, while on the second page of the will they were always out of alinement, being below that of the other letters.

A great many court records were introduced in testimony containing typewritten matter prepared in the office of Gates T. Ivy. From an examination of these papers the witness Wood identified a number as being pre-

pared on the Remington typewriter No. 10. He claimed that these papers show that the ''a'' was in proper aline-ment about the time that the alleged will was claimed to have been.prepared, but that several months previous to the propounding of this will for probate the ''a'' on this Remington typewriter went out of alinement, and is shown as it appears on the second page of the will. From this he concluded that the second page of the will was not written at the time of its date. It is also claimed that other documents written by Miss Malone show that she was an expert typewriter, whereas, it is claimed by him that the first page of the will shows cer-tain characteristics and inaccuracies and mistakes never made by Miss Malone. Some of these typewriting char-acteristics or inaccuracies which this witness finds on the first page of the will he also finds in the Ivy Okla-homa letter. He also pointed out to the jury certain things which indicated to him that the brads with which the two pages of the will are attached to an extra blank brown sheet had been removed, or rather that two of the three brads had been removed. The same thing he claimed about the carbon copy of the alleged will. It is not material to set out in detail all of the testimony of this witness. By means of these photographs he ex-plained in detail to the jury why he had arrived at his opinion, and all these exhibits, photographs, and all doc-uments were permitted by the court to be examined by the jury during their deliberations. We have also in this court examined all of these documents, including the original will and the carbon copy thereof. The witness Wood identified on cross-examination the carbon copy of the alleged will, and stated that both sheets of this copy necessarily were made at the time and were car-bons of the two pages of .the original will.

At the conclusion of the testimony of the witness Wood the contestants rested.

The proponents then introduced an expert photogra-pher from St. Louis, named McClosky. The testimony

of this witness is in effect that an expert photographer when he so wishes can make photographers entirely different from the things to be photographed. Some things may be accentuated or obliterated. He also identified certain photographs made and introduced in the trial.

Mr. Mechlin, of St. Louis, an expert on handwriting and signatures, was then introduced by proponents. He had examined numbers of the admitted genuine signatures of Young and the signature in question to the will. This witness, in short, testified that the signature on the will and those admitted to be genuine signatures of Young were written by one and the same person. At this stage of the trial, when this witness was placed upon the stand, the contestants objected to this testimony as not in rebuttal. The court held that, while the better practice would have been for this testimony to have been introduced in chief, yet that, in view of the importance of the suit, the testimony should be admitted.

Mechlin testified in detail about the formation of the different letters and the various signatures of Young, and why he thought the one to the will genuine.

Another expert witness who testified to the genuineness of the will signature was Sparkman, of Birmingham.

We neglected to state in detailing some of the testimony of the witness Wood, that he was asked on cross-examination to state what kind of typewriters wrote certain specimens exhibited to him. Mr. Hamlin, a lawyer of West Point, who had prepared these specimens, testified for the proponents, and his testimony was to the effect that Wood had been wrong in probably at least one-third of his identifications.

The chancery clerk, L. J. Howard, was then recalled to the stand by proponents, and testified that the carbon copy of the will was shown to him by Mr. Roberds, one of the attorneys, about the 29th day of December, and that from the contents of the carbon copy identified by the witness Wood it contains the same provisions as the

copy seen by him, and he believes it to be the same copy. He also testified to certain writing or identification marks appearing on the copy identified by Wood as being on the copy seen by him. This is another reason why he thinks it is the same copy he saw.

Miss Tiny Gates, stenographer for Gates T. Ivy, testified to the finding of the carbon copy in the office by her, and that the carbon copy identified as a carbon copy by the witness Wood was the identical copy found by her in Ivy's office.

H. J. Kornegay, sheriff at Clay county, testified that he was familiar with Young's signature, giving his reasons therefor, and that in his best judgment the signature on the will was that of Young.

C. B. Bouchillon testified that he had known Young for many years; that he had been postmaster, and had had other business dealings with Young; that he was familiar with his handwriting; that the signature on the will was Young's. On cross-examination he said that he believed it was Young's signature so strong that he knew it was his signature.

Whereupon the proponents rested.

After the conclusion of the testimony counsel for contestants requested the court to take a recess until noon the following day, as they expected by that time to have a witness by the name of Osborn present to testify as an expert in the case; that Osborn then was on his way from New York, and should reach West Point by that time; that he was generally recognized as the greatest expert on questioned documents in America. The court overruled this motion.

The cause was submitted to the jury upon oral argument and instructions of the court, resulting in a verdict for proponents.

Under this testimony the appellants contend they should have had a peremptory instruction; that the testimony, when considered with the exhibits in the cause;

consisting of the original will, carbon copy, photographs, and court documents, demonstrates that the signature upon the alleged original will was a forgery; that the first page of the will was written on an Underwood machine and the second page on a Remington, and that neither page was written at the time of the alleged date of the will; that the same Underwood machine was used in writing the Oklahoma letter from Ivy to Magruder above referred to and the first page of the will.

This court has carefully gone through all of these exhibits and has examined them not only with the naked eye, but with a magnifying glass. With much time and at much pains we have made the comparisons in this way of the different letters on the two typewritten pages, as well as the photographs of them contained in the record. It is not necessary to discuss in detail these alleged differences. Suffice it to say that we note some differences in some of them. We, however, further note as much difference in the general appearance and formation of the same letter as it appears at different places upon the first page of the will, and also the same thing about letters on the second page of the will. It is manifest that the typewriter or typewriters used in preparing this will were neither clean nor in first-class condition. We cannot say from this examination that these two pages of the will were written on different typewriters. For instance, the alinement of the letter "a" is not correct on either page in some instances. It appears below the line in some places on the first page as well as on the second page. Neither can we say that the same typewriter wrote the Ivy letter and the first page of the will. We find differences in the letters in these two documents. There are many things that enter into typewriting; the condition of the keys, the condition of the ribbon, and the stroke upon the keyboard may make the same letter have a different appearance.

The question of typewriters, though material, is not the vital issue in this case. It is merely a circumstance

bearing upon it.  While Miss Malone testified that both pages of the will were written upon one typewriter, which she thought was a Remington, yet she could be mistaken about this and at the same time be telling the truth about the signing and executing of the will by Young and the attesting of it by herself and Gates T. Ivy.  The make of the typewriter was not an important question; and, though her testimony was in the utmost good faith, she may have been honestly mistaken in the make of the typewriter she used at that time.  Shortly after this will was executed she left the employment of Mr. Ivy, and worked in several different places up until the trial of this cause three or four years later; consequently her memory, may have been at fault as to the typewriter used by her in the office of Ivy in the writing of the will.  Though she did not recollect it, it is possible that there was more than one typewriter in this law office.  In fact, from certain papers prepared in this office along about that time, and introduced in testimony, it might readily be inferred from an examination of them that they were not all written upon the same typewriter.  There is one decree upon which the asterisk shown on the will also appears.  If this is an Underwood asterisk, as testified to by the witness Wood, then this decree, evidently prepared in Ivy's office on July 31, 1918, was written on an Underwood machine.

While, the details of the transaction were, of course, admissible in testimony, the vital question was whether or not Young signed and executed this will, and these facts were testified to by the two subscribing witnesses, Gates T. Ivy and Miss Malone.  While Ivy is one of the attorneys in the case, and is to receive a fee contingent upon the success of the probate of the will, Miss Malone is uncontradictedly shown to have no interest whatever in the result of the suit.  Neither the character nor integrity of either of these witnesses is attempted to be impeached, except by the general contradictious which may arise

from the testimony of the two expert witnesses introduced by contestants.

In attesting a will the attesting witnesses must not only witness the signing and publishing of the will by the testator, but it is also their duty to satisfy themselves that he is of sound and disposing mind and memory, and capable of executing a will. These facts were also testified to by these two subscribing witnesses. For this reason, in the case of *Brock* v. *Luckett's Ex'rs,* 4 How. 459, this court said that the testimony of these subscribing witnesses is entitled to greater weight than the testimony of those who had no such duty to perform, and especially is entitled to greater weight than the testimony of witnesses who were not present at the time of executing the will, and who did not see the testator the day of its execution. See, also, *Gillis* v. *Smith,* 114 Miss. 665, 75 So. 451; *Helm* v. *Sheeks et al.,* 116 Miss. 726, 77 So. 820.

In the Sheeks Case this court said that the testimony of the two subscribing witnesses is the best evidence of the due execution of the will.

The proponents in this case made out a *prima-facie* case by the proving of the due execution of the will by these two subscribing witnesses. While both of them proved its execution, Miss Malone was the only one who testified upon what typewriter it was written. Ivy was not in the room when that was done, and consequently did not testify on that point.

Proponents, however, did not stop with the testimony of the attesting witnesses, but introduced a number of citizens of West Point, bankers, county officers, and others who had known Young for years, and who were familiar with his signature, had frequently had occasion to see it, and all of whom testified unqualifiedly and positively that the signature on the alleged will was the genuine signature of Young. It is a matter to be noted that not a single person who knew Young in his lifetime, and who was familiar with his signature, testified in

favor of the contestants that the signature on the alleged will was a forgery; that no one save the two experts testified to this fact. We have examined the photographs of the signature on the will, the signature itself, and many admitted genuine signatures of Young, both with the eye and with a magnifying glass. We imagine we see pen lifts in some of the signatures corresponding to the pen lifts testified to by the expert witnesses for contestants. We imagine we see certain characteristics in the will signature and in other genuine signatures of Young. Some appear in one and some appear in others. Certainly the jury, the original triers of fact, were amply justified in their examination of the signatures coupled with the testimony of the witnesses for proponents, to say nothing of the testimony of the attesting witnesses, in believing and being satisfied that Young signed the will.

The testimony of Miss Gates about the finding of the carbon copy of the will and her identification of it in testimony as the same one found in the office of Ivy in December, coupled with the corroborative testimony of Howard, chancery clerk, that he examined this copy about that time, evidently had great weight with the jury. This carbon copy could not have been in existence at that time and the will forged months later, because from the testimony of the witness Wood the carbon copy necessarily was made at the time of the writing of the two pages of the alleged will.

In fact, had the jury found otherwise, a very serious question would be presented to this court as to whether or not a verdict based upon the testimony of these two expert witnesses would be allowed to stand by this court, contradicted as it is not only by the two attesting witnesses but by numbers of witnesses to whom Young was personally known and entirely familiar with his handwriting, who unqualifiedly testify to the genuine signature on the will. We shall only say that in our judgment, at least, a vast preponderance of the testimony supports the verdict of the jury. It is not necessary in this opin-

ion to consider the reliability or unreliability of expert testimony when opposed by positive testimony, because the jury has rejected the expert testimony of contestants, and believed that of the subscribing witnesses and others. Two expert witnesses also testified to the genuineness of the signature. From the contradictory testimony of these experts, at least, this court must find that experts are not infallible. In this case they are equal in number, and absolutely contradict each other. So, like all other human beings, experts are fallible, and sometimes make mistakes.

Under this testimony it would have indeed been a surprise to this court for a jury to have rendered any other verdict than one in favor of the genuineness of this will. We are satisfied that the verdict of the jury in this case is according to the law and the testimony.

An assignment of error is predicated upon the refusal of the chancellor to sustain a challenge for cause to a juror by the name of Rose. The substance of the examination of this juror was that he could try the case fairly and impartially; that his wife was a sister of Mrs. Price Ivy, whose husband, Dr. Ivy, was a brother of Gates T. Ivy. The court was correct in overruling this challenge. Rose was not related by affinity to Gates T. Ivy. This supposed relationship seems to be the basis of this objection. The juror Rose, however, was challenged peremptorily, and there is no contention that the cause was not tried by a fair and impartial jury.

It is unnecessary to consider the alleged errors of the court on the admission and exclusion of testimony. It is sufficient to say that we think from the admitted testimony both proponents and contestants were permitted to fully present their respective causes.

It is also insisted that the court erred in admitting in testimony the carbon copy of the will. We think this was very material testimony, and should have been admitted. It was certainly evidence of the fact that the will existed

before the time, under the theory of appellants, when it was forged.

We find nothing wrong with the instructions. The issue was fully and fairly and correctly submitted to the jury under them.

It is insisted that, since the proponents of the will did not rest their cause when they made out a *prima-facie* case by the introduction of the two subscribing witnesses to the will, but further placed upon the stand witnesses to prove the genuine signature of the decedent, the court should not have permitted them, after the contestants closed their cause, to introduce further testimony along the same line. This court has declared that the ordinary procedure is to make out a *prima-facie* case by the introduction of the subscribing witnesses to a will. Proponents may then either rest their cause or introduce other testimony. In view of the testimony of the two expert witnesses for the contestant, we think the court was correct to permit the proponents in this cause, in order that justice might be done and that the jury might have the benefit of the testimony of other witnesses, to reopen the case and introduce this testimony. Some of it was not strictly rebuttal testimony, but the court would certainly have permitted its introduction even though out of order upon the request of counsel. In fact, courts, and particularly chancery courts, often do remand a case to rules after both sides have closed the taking of testimony for the purpose of taking other testimony. Necessarily there is a wide discretion vested in the chancellor to do this, and in this case this discretion was not abused.

The contestant's motion for a new trial was correctly overruled. This is assigned as error. One of the grounds stated in the motion was that of newly discovered evidence, namely, that they could prove by the Memphis Remington Agency that Gates T. Ivy bought a Remington typewriter No. 10, from this agency in 1914. When this machine was in fact bought by Ivy was not testified

134 Miss.—49.

to either by him or any other witness. It was stated by one of counsel that this machine was not owned by him at the time of the writing of the will. This testimony consequently would not have been in rebuttal. From certain papers prepared in the office of Ivy we infer that the contention was made that this typewriter was used in their preparation before and after this time. The contestants, however, could have gotten the number of this typewriter certainly by proper application to the court before the trial if they had wished to introduce any testimony in regard thereto. Viewing the record as a completed whole, we are satisfied that the introduction of this testimony would not have in any wise changed the verdict of the jury.

The witness Osborn arrived from New York and testified at the hearing of the motion for a new trial. His testimony briefly corroborated that of Wood and the other expert introduced by contestants, which testimony was cumulative. Had counsel, however, desired this testimony on the trial in chief, we see no reason from the record why they could not have procured his attendance on time. He was beyond the jurisdiction of the court; consequently, the court could not have compelled his attendance. Counsel for contestants announced ready for trial. It would have been a strange procedure, indeed, for the chancery court of Clay county to have recessed from one day to another to await the coming of an expert witness, however eminent though he may be in his calling or profession.

After a most careful and painstaking investigation of this entire record, we are satisfied that the decree of the lower court should be affirmed.

*Affirmed.*