# CASES ARGUED AND DECIDED

—— IN THE ——

# SUPREME COURT OF MISSISSIPPI,

—— AT THE ——

## MARCH TERM, 1903.

BENJAMIN KING ET AL. *v.* WALTER H. ROWAN ET AL.

1. WILLS. *Attesting witnesses. Weight of evidence.*

Whether attesting witnesses have opportunities which are superior to those of other witnesses, to judge of and know the testator's mental capacity, at the time of the execution of his will, is a question of fact for the jury and not of law for the court.

2. SAME. *Devisavit vel non. Insanity. Burden of proof.*

Where on an issue *devisavit vel non* the question is whether the testator was sane or insane at the time of the execution of the will, the contestants are not required to prove his insanity beyond all reasonable doubt. *Mullins* v. *Cottrell,* 41 Miss., 291, disapproved.

3. SAME. *Instruction. Reasonableness or unreasonableness of will.*

Upon an issue *devisavit vel non* an instruction for contestants is erroneous if it authorize the jury, without qualification or limitation, to consider the reasonableness or unreasonableness of the will.

FROM the chancery court of Copiah county.

HON. HENRY C. CONN, Chancellor.

The suit was a contest of the will of Mrs. Evaline King, deceased widow of the late Col. Benjamin King, of Copiah

county. Rowan and others, appellees, grandchildren of the testator, were the contestants, and Benjamin King and Mrs. Eva King Bloom, appellants, a son and a daughter, respectively, of the testatrix, were the proponents of the will. By the terms of the will one-third, approximately, of the testatrix's estate was devised and bequeathed to her son, Benjamin, and two-thirds, approximately, thereof to her daughter, Mrs. Bloom; nothing whatever was given to the grandchildren, the children of deceased daughters of testatrix.

The contestants claimed, first, that Mrs. King was mentally incapacitated at the time she executed the will, and, second, that its execution was procured by undue influence exercised by Benjamin King and Mrs. Bloom, the devisees and legatees under and the proponents of the will.

The issues thus presented, with a large number of instructions, were submitted to a jury, which found for contestants. The court below overruled appellants' motion for a new trial, and adjudged the will void, whereupon appellants, proponents, appealed to the supreme court.

The instructions given and refused by the court below are sufficiently stated in the opinion of the court.

A statement of the evidence is unnecessary to an understanding of the legal questions decided by the court.

*McWillie & Thompson,* for appellant Mrs. Bloom; *Mayes & Harris,* for appellant Benjamin King; *Benjamin King pro se,* and *R. N. Miller,* for both appellants.

The state of Mrs. King's feelings towards the contestants, for which the proponents are in no way responsible, fully accounts for their not being made the objects of her bounty and is entirely consistent with the most perfectly sound mind. There is no evidence in the record which can justly be said to indicate undue influence. The partiality which makes a testator discriminate between relatives in equal degree and which may be the result of affection or gratitude affords no foundation for

the charge of undue influence.   In this case we find the persons favored were in closer relationship; that one of them, her son, had been all the time in immediate association with his mother, living upon an adjoining lot, often providing her with delicacies for her table and assisting her in the management of her business, and that the daughter, who lived some thirty or forty miles distant, corresponded with her mother, exchanging gifts and visits with her, and in the great trial of her last illness was her stay and comfort; and yet between this son and daughter the testatrix discriminated, giving the daughter, who was closer to her heart, more than she did the son.   In the absence of all evidence of force, fear, threats and coercion, whereby the will of another is made to take the place of that of the testator, the contestants have been forced to rely upon such trivial circumstances as that the son, Benjamin King, was the draughtsman of the will, and that he went after the subscribing witnesses.   As the old lady was entitled to make a will, and had to leave the drawing of it to another, and by reason of her illness was unable to go after the witnesses herself, the import of these facts is not discernible.   That Mrs. King did not intend in any case to give her property, or any part of it, to her grandchildren, is shown by Dr. Rowan's testimony that she stated that if Mrs. Bloom did not stop worrying her about it she would give it to a charitable institution.   In no event were the grandchildren to get it.

The claim of undue influence being wholly unsupported, the contestants in their declaration endeavored to show by equally flimsy evidence that Mrs. King was mentally incapable of making a will at the date of the one in question.

The only witness relied on to show mental incapacity was Dr. J. A. Rowan, the father of several of the contestants, who was also the attending physician of Mrs. King in her last illness.   This gentleman's idea of the state of Mrs. King's mind was quite different from that of everyone else who saw her, and there are some features of his testimony which it may be profit-

able to note.  His classification of her mental disturbance was
"moral civil insanity," something new in medical jurispru-
dence.  Moral insanity may be a question with reference to acts
of the subject whether civil or criminal, but "moral civil insan-
ity" as a technical term is not found in any authority within
our reading.  The reasons he gives for her moral insanity,
that morbid state indicating a perversion of the moral feel-
ings, have no relation whatever to morals, but merely to intel-
lectual capacity.  There was absolutely nothing in the case
upon which the charge of moral insanity could be founded.
Even the resentment at the coldness and indifference of her
grandchildren which Mrs. King evidently entertained could not
be exaggerated into the vindictive and causeless hatred which
sometimes indicates moral insanity.  Moreover, it was not a
part of the campaign to put forward her feeling toward her
grandchildren as the indication of her insanity, for that did not
consist with the idea that the testatrix had no such feeling and
would have provided for them in her will but for undue influ-
ence.  The indications of "moral civil insanity" mentioned by
Dr. Rowan as characterizing the case, were jumping from one
subject to another, irrational sayings, and loss of memory, but
as the Doctor could not recall an instance of her jumping from
one subject to another, nor a single irrational speech, his mem-
ory would seem to have been the worse of the two.  He could
refer to but one circumstance to show her loss of memory, and
we find that in the statement that on one occasion when
she called for ice water she seemed to have forgotten that
she had already had some not long before.  The Doctor's esti-
mate of Mrs. King's mental condition can best be judged from
the fact that, although he says it kept getting worse and worse
all the time, he thinks what she said some time after the date
of the will worthy of being embodied in his testimony as the
language of a person of sound mind.  She was sufficiently sane
to be quoted when her language might be prejudicial to the
proponents, but not at other times.  He says that after the

date of the will, she told him she had been tricked and wanted to get well in order to right a wrong.    Conceding that this conversation took place as stated, it does not necessarily relate to the will, which she could easily alter without getting well, but it does show that Dr. Rowan regarded her as then capable of judging of the nature and quality of her own acts, and as well the conduct of others.    If she could detect a trick, she was not an imbecile; and if she wished to correct a wrong, she was not a moral pervert.    The proponents moved to exclude this statement of the witness, because it referred to a conversation after the execution of the will, and the action of the lower court in admitting it is assigned for error; but it strikes us that the case of the contestants is rather hurt than helped by it, for it shows that even the Doctor credited Mrs. King with lucid intervals after the date of the will.

The court will observe that Dr. Rowan did not pretend to know the state of Mrs. King's mind at the time she made the will, and the subscribing witnesses, old acquaintances, say her mind was as clear as it had ever been in her life.    Leaving out the testimony of Ben King and Mrs. Bloom, when we consider the weight given to the testimony of subscribing witnesses in *Brock* v. *Luckett's Exrs.,* 4 How. (Miss.), 459, and the degree of proof required to show mental incapacity as decided in *Mullins* v. *Cottrell,* 41 Miss., 291, it cannot be doubted that in this case the appellees were entitled to have the jury directed to return a verdict in their favor.

What is undue influence?    Every case of influence exerted is not "undue influence."    "Undue influence" must be influence obtained by fraud or fear, and must be of that degree which amounts to force or fraud, which destroys the free agency of the testator and compels him to do what is against his will, and which he is absolutely unable to refuse and too weak to resist.

"If the testator is too weak to exercise his will, and his judgment has been overcome by force or fear or importunities carried to that degree which amounts to the overthrow of his free

agency, then such influence is undue." *Knox* v. *Knox,* 36 Am. St. Rep., 235; *Waddington* v. *Busby,* 14 Am. St. Rep., 706; *In re Hess Will,* 31 Am. St. Rep., 206.

In other words, any influence which is so great and unfair as to substitute the will of another for that of the testatrix is "undue." But it has never been held that the influence which grows out of affection and kindly services of children, husband, wife, parents, or kindred was "undue."

The influence of Benjamin King, with his mother, or any son with a mother, has never been denounced as "undue" by any court in the world, and on the contrary, it is universally held not to be "undue influence." *Thompson* v. *Ish,* 17 Am. St. Rep., 552; *Goodbar* v. *Lidikey,* 43 Am. St. Rep., 296; *In re Hess Will,* 31 Am. St. Rep., 665; *Burney* v. *Torrey,* 46 Am. St. Rep., 33; *Henry* v. *Hall,* 54 Am. St. Rep., 22.

"The presumption in favor of the validity of a will is not overcome by the fact of unjust discrimination in favor of a son, who is both a devisee and executor under the will and is shown to have had a great influence over the testator in her business affairs, nor do these facts cast the burden of proof upon him to establish the validity of the will." *Berberet* v. *Berberet,* 52 Am. St. Rep., 634; *Eastis* v. *Montgomery,* 36 Am. St. Rep., 227; *Knox* v. *Knox,* 36 Am. St. Rep., 235; *Richmond's Will,* 21 Am. St. Rep., 85; see *Schierbaum* v. *Schemme,* 80 Am. St. Rep., 618, and note.

The burden of proof to establish both "undue influence" and insanity is upon the contestants of this will. *Cash* v. *Dust,* 64 Am. St. Rep., 576.

The above authorities establish that the burden of proof of "undue influence" is upon the contestants in the case. And they must show also, that it operated on the mind of the testatrix at the time that the will was made. They must show that this "undue influence" was present and existing, and dictated the will the day it was made, to wit: July 1, 1901. *Knox* v. *Knox,* 95 Ala., 495; 36 Am. St. Rep., 235; *In re*

*Kaufman,* 59 Am. St. Rep., 179; *Englert* v. *Englert,* 82 Am. St. Rep., 808.

"No amount of persuasions or appeals to the affection of ties of kindred or sentiments of gratitude for past services or pity for future destitution and the like, constitute 'undue influence.'" *Gay* v. *Gillilin,* 1 Am. St. Rep., 712.

"To invalidate a will, on the ground of 'undue influence,' it must be proved that it was procured by force, threats or coercion, destroying free agency. The exercise of the influence springing from the family relations, or from the consideration of service, affection or gratitude is not 'undue,' even though it be pressed to the extent of unreasonable importunity." *Hazard* v. *Hazard,* 2 Hun., 446, S. C., and "it is a general rule that the provisions of a will of themselves are not evidence of 'undue influence' or of mental incapacity, whatever the terms may be." *Floyd* v. *Floyd,* 49 Am. Dec., 629, and note; *Dickie* v. *Carter,* 42 Ill., 388.

"'Undue influence' cannot be presumed or inferred from opportunity or interest, but it must be proved to have been exercised, and exercised in relation to the will itself, and not merely to the other transactions." *Tyler* v. *Gardner,* 35 N. Y., 613; *Dees* v. *Wandle,* 3 Thomp. & C., 129; *Rutherford* v. *Morris,* 77 Ill., 414; *Bicknell* v. *Bicknell,* 2 Thomp. & C., 103; *Seguine* v. *Seguine,* 4 Abb. App., 198; 35 How. Pr., 343.

Extreme old age, sickness, pain or suffering are not of themselves sufficient to invalidate a will. *Stevens* v. *Leonard* 77 Am. St. Rep., 446; *Taylor* v. *Kelly,* 68 Am. Dec., 159. Nor mere eccentricity, however great. *Addington* v. *Wilson,* 60-61 Am. Dec., 84, and note; *Dran* v. *Nagley,* 80 Am. Dec., 620.

The above array of authority, carefully read, demonstrates that no sort of suspicion of "undue influence," growing out of the most sacred relation of life, can be presumed, but on the contrary, the policy of the law is to encourage and give full play to those tender influences growing out of sacred family

relations.    And that because Benjamin King was the son of his mother, and served her in her business affairs and wrote her will, and because Mrs. Bloom was her daughter, and nursed her in her last sickness and protected her sick bed from interruptions by visits, of even her grandchildren, and because the fact that both Mrs. Bloom and Benjamin King argued and advised with her and tried to induce her to make her will in conformity with their wishes, that none of these things were unlawful or "undue."

There is no dispute that if "undue influence'" existed, it must, in order to overthrow the will, influence, direct and control the free agency of the testatrix in and about the execution of the will itself at the very time it was made.    The testimony of Mrs. Bloom, and of King, supported by that of the two attesting witnesses, Bridewell and Moody, stands absolutely undisputed or uncontradicted, and shows conclusively that on the 1st day of July, 1901, when Mrs. King made this will, it was read over word by word to her, and she declared it the expression of her free will, and that there was no sort of "undue influence" there present of any kind, and the court should then and there have withdrawn that issue from the jury. *In re Kaufman,* 59 Am. St. Rep., 179.

"If a will is shown to have been executed according to law by a person of sound mind, the burden of proving that it is the result of fraud and 'undue influence' is upon the contestants who make the charge, and the mere fact that it apparently unjustly discriminates against one of the testator's children in favor of another, does not shift the burden of proof to that other to account therefor.    A man has the right to will his property to whomsoever he chooses, and the beneficiary is not bound to account for his choice."    *Schierbaum* v. *Schemme,* 80 Am. St. Rep., 604.

The testamentary capacity of the testatrix.    What is the standard required by the law of capacity to make a will?    We

repeat that extreme old age and sickness, pain and suffering — none of these things nor all combined make testamentary incapacity. See cases *supra.*

"Capacity to make a will is, that at the time of its execution, he be possessed of sufficient intelligence and memory to fairly and rationally comprehend the effect of what he is doing, and the nature and condition of his property; to understand who are and who should be the natural objects of his bounty, and his relation to them, the manner in which he wishes to distribute it among, or withhold it from them, and the scope and bearings of the provisions of the will he is making.

"Mere physical weakness or disease, old age, eccentricities, blunted perception, weakening judgment, failing memory or mind, are not necessarily inconsistent with testamentary incapacity." *Richmond's Appeal,* 21 Am. St. Rep., 85, and note.

"A man may have mental capacity to make a will and yet be incapable of making a contract or managing his estate." *Maddox* v. *Maddox,* 35 Am. St. Rep., 734.

"A sound and disposing mind in a testator does not imply that the powers of his mind may not have been weakened or impaired by old age or bodily disease. A testator may be incapacitated by age and failing memory from engaging in complex and intricate business, and yet be able to give simple directions for the disposition of his property by will." *Hall* v. *Perry,* 47 Am. St. Rep., 352. The testatrix in this last case was much older and much more infirm than Mrs. King.

The authorities which draw the proper distinction between an intellect enfeebled by disease and testamentary incapacity are confirmed by our own courts in *Brock* v. *Luckett,* 4 How. (Miss.), 482, when it quotes with approval the case of *Clark* v. *Cartright,* 1 Ecc. R., 47.

The record shows that Mrs. King was 74 years of age, but that the usual infirmities of age had not fallen upon her. But on the contrary, that she was a woman of unusual judgment and strong will up to the time of her death, with the exception

of the accompaniments of weakness attendant upon her illness. Bridewell, an unusually intelligent witness, and one of the subscribing witness to the will, after hearing this testimony as to her mental capacity, says "that on the day and at the time she executed the will, he never saw her when her mind and judgment seemed to be clearer and more rational.

The contestants, with the burden of proof upon them, rely alone upon the testimony of J. A. Rowan, whose testimony shows that he is not an expert. *Kerr* v. *Lunsford*. 2 L. R. A., 668. A non-expert witness can never give his opinion without stating the facts on which they are founded. Gillett on Indirect and Collateral Evidence, sec. 214, and note 1. 1 Greenleaf on Evidence, 580, last edition; 1 Rice on Evidence, pp. 348, 250, 354, 355; 1 Wharton on Evidence, sec. 513; 10 Rose Notes, U. S., 841; 11 U. S., 620, 621; *Hopkins* v. *Wheeler,* 79 Am. St. Rep., 819; 22 Am. Rep., 441; 50 Am. Dec., 329; 133 N. Y., 544; *Englert* v. *Englert,* 82 Am. St. Rep., 808.

The court erred in refusing to give the second charge for the proponents, because it is in the very language of our court in *Brock* v. *Luckett,* 4 How. (Miss.), 482; and is not an invasion of the province of the jury; it is the law that subscribing witnesses are entitled to greater weight than others, and it ought to be given on the same principle that courts give caution in the application of circumstantial evidence.

The third instruction refused for proponents ought to have been given, because it is in the very language of our court in the case of *Mullins* v. *Coltrell,* 41 Miss., 292.

The twelfth instruction given for the contestants is exceedingly vicious and hurtful. It is liable to a double objection.

A specially objectionable feature of this instruction is the fact that it informs the jury that in considering the question as to whether there was any undue influence used, they are to take into consideration "the reasonableness or unreasonableness of the will."

It is impossible to deny that from this instruction the jury would understand that in passing on the question of undue influence they are authorized to take into consideration what the members of the jury might conceive to be an inequality and a possible injustice in the provisions of the will as between one set of children and another.

We submit that such is not the law. The question of undue influence cannot be brought to the test, on the trial of an issue, *devisavit vel non*, of the notions and ideas and sentiments of a jury about fairness and inequality as between various members of the testator's family. *Turnure* v. *Turnure*, 35 N. J. Eq., 437; *Kise* v. *Heath*, 33 N. J. Eq., 239; *Bundy* v. *McKnight*, 48 Ind., 503.

This court has itself, in the case of *Mullins* v. *Cottrell*, 41 Miss., 291, 324, expressly decided that a will may on its face be reasonable, even where the deceased disinherited his daughter and left his property to his neice, which was a further departure from the ordinary rule of inheritance than has occurred here.

*R. P. Willing, Jr., H. J. Wilson*, and *Robert B. Mayes*, for appellees.

The record shows abundantly that, at the time of Mrs. King's death, she was in a weak and enfeebled condition; an operation had been performed, and she had dwindled away from a weight of 150 pounds to only 75 pounds. The fact that she subsequently died shows that she was then on her death bed. She was attended by her daughter and son, the son being a lawyer. All the others of her relatives were excluded from her, and she died a very short time after the execution of the will. She then had fever, and was under the influence of narcotics, and it is stated as the opinion of Dr. Rowan, the attending physician, that she did not have sufficient mental capacity to make a will; but be this as it may, this case was tried before a jury, and from all the facts and circumstances, whether from mental incapacity

or undue influence, it matters not, the jury, after considering all these things, brought in a verdict finding that the pretended will was not the last will and testament of Mrs. Evaline King.

In the case of *McAlexander* v. *Puryear,* 48 Miss., 420, the court said: "A verdict will not be disturbed unless it is manifest from the whole record that it is clearly wrong, or unless misdirection or other apparent errors may have produced it."

Again, in *Railroad Co.* v. *Cantrell,* 70 Miss., 329, and *Railroad Co.* v. *Williams,* 67 Miss., 18, the court said: "If a verdict is supported by evidence, and the court cannot see that the jury was unwarranted in reaching its conclusion, it will not be disturbed, although a finding for the opposite party would have been more satisfactory to the court."

Again, in *Harris* v. *Haliday,* 4 How. (Miss.), 338, the court has said that before a verdict will be disturbed, "the preponderance of evidence against the verdict must be very clear." And, again, in *Watson* v. *Dickens,* 12 Smed. & M., 608, the court said: "Where the mind cannot repose with entire confidence and certainty upon a conclusion in favor of either party, the verdict will not be disturbed."

The instructions asked for by contestants, and granted by the court, are correct announcements of what the law is in reference to this class of cases, and there is no error in them. 25 Am. & Eng. Ency. Law (1st Ed.), 970; 27 Am. & Eng. Ency. Law (1st Ed.), 453, 454; *Ib.,* 501; 25 Am. & Eng. Ency. Law (1st Ed.), 992; 1 Greenleaf on Evidence, Sec. 13.

Argued orally by *R. N. Miller, T. A. McWillie,* and *Edward Mayes,* for appellants, and by *Robert B. Mayes,* for appellees.

WHITFIELD, C. J., delivered the opinion of the court.

The court below properly refused instruction No. 2, asked by the proponents. It is not the law that the testimony of subscribing witnesses is entitled to any greater weight than that of other witnesses with equal opportunities for observation. The

charge proceeds upon the idea that the mere fact of being sub-
scribing witnesses entitled their testimony to such greater
weight.　It does not proceed upon the theory that the value of
the testimony of such witnesses is due to the fact simply that
they do actually improve the opportunity given them for the
more accurate and careful observation of the testator's capacity
to make a will, and all the circumstances surrounding the exe-
cution of the will.　The value of the testimony of any witness
depends upon his opportunity for observing the fact or facts
about which he testifies, and, since subscribing witnesses are
called on to witness the execution of the will and all attendant
circumstances illustrative of the capacity of the testator to
make a will, and to observe whether or not, though capable, he
has been unduly influenced, their testimony on these points, if
they did fully improve the opportunity given them for observa-
tion, is, of course, more valuable than that of witnesses who did
not enjoy like opportunity for observation.　But this value is
based upon the fact that the subscribing witnesses have both
enjoyed and improved such opportunity for observation denied
to other witnesses, and not upon the simple fact that they are
subscribing witnesses.　Subscribing witnesses, in the varying
cases, may be persons of greatly differing intelligence, and of
very vastly different capacity for observing, and making proper
deductions from such obervation; and, besides, the opportu-
nities which may be afforded at the time of execution of a will
for such observation may differ very widely according to what
may occur at the time.　The chancellor, therefore, properly
refused an instruction which declared the rule that the testi-
mony of subscribing witnesses was to have greater weight than
the testimony of other witnesses simply because the law
required subscribing witnesses "to perform a certain duty."　It
is not a question of what the law required, but of whether the
facts showed that the subscribing witness was afforded the
opportunity of observation, and improved that opportunity.
The best statement of the law on this subject that we have

been able to find is contained in *Crandall's Appeal,* 63 Conn., at page 368; 28 Atl., 531; 38 Am. St. Rep., 375, where the court said: "The second request is: 'The jury should give special prominence to the testimony of the three attesting witnesses, both upon the question of capacity and of undue influence, because they were present at the time and place of the execution of the will, and had the means and the opportunity of judging of the testator's capacity, and are regarded in the law as placed around the testator in order that no fraud may be practiced upon him in the execution of the will, and to judge of his capacity.'    The effect of a compliance with this request would have been to place the attesting witnesses upon a higher plane, in the estimation of the jury, on the question of capacity and of undue influence, than other witnesses, although the latter may have had equal, or even superior, means of knowledge. That was, in effect, the claim of the appellees.    And they now claim that the refusal of the court to comply with his request was an error, which entitled them to a new trial.    We are aware of no principle of law or of any adjudged case which will justify this claim as broadly as it is here made.    In the eye of the law, all witnesses of equal intelligence and with equal means of knowledge are equally credible.    Had there been three other witnesses present, and their attention had been called to the condition of the testator precisely as was that of the attesting witnesses, we know not why their testimony would not have been entitled to the same consideration on the question of capacity and of undue influence.    As the case stood, the attesting witnesses were present when the will was executed, and had an opportunity to observe the condition of the testator at the precise time.    The other witnesses were not present, and had no such opportunity.    So far as the matter was concerned, the appellees had the full benefit of it; for the jury were fully and clearly told that the question was as to the condition of the testator at that time, and that the nearer to that time the witnesses observed him the more important was their testimony.

We know of no other advantage that those witnesses had in re-
spect to the questions in issue." In *Burney* v. *Torrey,* 100 Ala.,
at page 172; 14 South, 690; 46 Am. St. Rep., 33, the court
says on this subject: "The testimony of a witness who attested
the will should be weighed and considered as that of any other
witness.    The fact that he was an attesting witness of itself
does not entitle his evidence upon a question of testamentary
capacity to greater weight than he would otherwise be entitled
to, except, perhaps, that by reason of his being an attesting
witness the law authorizes him to give his opinion of the mental
capacity of the testator."    The same doctrine is laid down in
Underhill on Law of Wills, vol. 1, sec. 102; Am. & Eng. Enc.
of Law (1st ed.), vol. 25, p. 1016.

We note the fact that the instruction is taken almost literally
from the opinion of the court in *Brock* v. *Luckett's Executors,*
4 How. (Miss.), 482.   But it is not always safe to take the lan-
guage of a court *arguendo,* and use it literally in an instruction.
Instructions must be suited to the facts of the particular case.

The court also properly refused instruction No. 3, asked for
proponents.    It is not the law that insanity of a testator at the
time of executing a will is to be proved, where the issue is a
purely civil one, beyond all reasonable doubt.    The rule to the
contrary is too well settled to require citation of authorities, and
we disapprove of the ill-advised statement to the contrary in
*Mullins* v. *Cottrell,* 41 Miss., 291, cited from an old English
case in 3 Haggard's Ecclesiastical Reports.

We think, however, that fatal error was committed by the
court in the twelfth instruction for the contestants in telling the
jury that they might, in determining whether undue influence
had been used, consider "the reasonableness or the unreasonable-
ness of the will," without qualification or limitation.    Here
was a will which gave two-thirds of the estate to the only living
daughter, one-third to the only living son, and nothing to two
sets of grandchildren by two deceased daughters.    The jury
may well have been misled by the unqualified manner in which

this clause in this instruction authorized them to consider the reasonableness or unreasonableness of the will as showing undue influence. The largely prevalent popular opinion that a will is unreasonable which discriminates as this will did may very likely have operated with this jury under this instruction. There doubtless are many cases in which the unnaturalness or unreasonableness of a will may, under proper qualifications, be accepted by the jury as one of the elements in determining the validity of the will as one having been obtained by undue influence, or as having been made without testamentary capacity. But courts should always, in giving this principle in charge to a jury, be careful to scrupulously guard the principle, so as to inform the jury that the issue which they are to try is whether the testator had testamentary capacity, or whether, though having it, he had been unduly influenced; and not whether, in the opinion of the jury, the will was an unnatural or an unreasonable one. It should be made clear to the jury that, however unreasonable and unnatural or unjust they may think the will is, they must uphold the will if, notwithstanding, they believe the testator had testamentary capacity, and was not unduly influenced. Underhill, in his work on Wills, vol. 1, sec. 105, thus expresses the rule: "It is, therefore, reversible error for the court to single out an unequal distribution from all facts in evidence, and to give a special instruction as to the effect that would have in determining that the testator was insane. The most that should be told the jury is that they may consider unnatural and unreasonable provisions, not alone, but in connection with all the evidence; and that, though they may believe the testator was not prompted by natural affection when he made the will, or although they may think its provisions are grossly unjust, still if, upon all the evidence, they believe the testator possessed capacity, his will must be sustained." The supreme court of California very accurately states our idea in *McDevitt's Case,* 95 Cal., 17, 30 Pac., 101, where the court said: "The right to dispose of one's property by

will is most solemnly assured by law, and is a most valuable incident to ownership, and does not depend upon its judicious use.     The beneficiaries of a will are as much entitled to protection as any other property owners; and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what is just and proper." The instruction in this case is put far too broadly. It should have been carefully limited as stated.     The jury may well have based their verdict on this instruction.     And what makes it especially singular that this principle, thus unqualified, should have been stated in this charge, is that the court in the sixth charge for the proponents told the jury that the following was the law: "A will can never be held invalid because anybody, or even the jury, may think it unreasonable and unjust.     That is the question that the law commits alone to the testator for his or her decision. Juries have no right, and courts have no right, to sit in judgment upon the justness and reasonableness of the provisions of a will."     This sixth charge, itself too broad, is in direct and irreconcilable conflict with the clause quoted in the twelfth charge given to the contestants.     And we are at a loss to understand how the very accomplished chancellor of the court below should have fallen into this error — a fatal one, upon the peculiar facts of this case — except it be for the reason that counsel on both sides had wearied him out with a wholly unnecessary number of requests for instructions.     Counsel for proponents obtained twenty-six instructions and were refused five; thirty-one in all.     Counsel for contestants obtained thirteen instructions, and were refused three; sixteen in all.     In other words, the chancellor was actually inflicted with requests for forty-seven instructions in this case — a most unwise policy for counsel on both sides.

We have been very earnestly urged to hold that the court should have given a peremptory instruction for the proponents. The facts in this case are so voluminous, and the value of the

different facts testified to varies so greatly, that we prefer resting the reversal on the ground stated. Possibly no member of this court, if on the jury, would have found as the jury did; but that fact furnishes no true test for determining whether the verdict of the jury is manifestly wrong. *Railroad Co.* v. *Cantrell,* 70 Miss., 329; 12 South, 344. We are not authorized to exercise the delicate and difficult function of declaring the verdict of a jury manifestly wrong, except in those very rare cases where the evidence shows it to be so most convincingly and indubitably. As yet we feel better satisfied in remanding the case for a new trial. It may be that both sides may be able to introduce further testimony, which may make the matter more clear one way or the other.

*Reversed and remanded.*