FORTENBERRY v. HERRINGTON.

(Division B. May 13, 1940.)

[196 So. 232. No. 34117.]

Rawls & Hathorn, T. B. Davis, and Connor & Hammond, all of Columbia, for appellant.

Hall & Hall, Bernard Callender and Henry Mounger, all of Columbia, for appellee.

**McGowen, J.,** delivered the opinion of the court.

S. A. Wilkes died testate on November 20, 1937, and his will was promptly probated in the common form. Later the appellee, Mrs. Cordia Wilkes Herrington, a daughter of decedent, filed her petition to contest the will, alleging that it was the product of (1) undue influence, and (2) of the mental incapacity of the decedent to execute a will. Mrs. Pearlie Wilkes Fortenberry, proponent of the will, a half-sister of the decedent, filed her answer, denying the material allegations of the petition. The issue devisavit vel non was made up, and the two issues were submitted on the evidence.

The court gave a peremptory instruction in favor of the proponent on the issue of undue influence; and submitted to the jury the question of mental capacity. The jury found a verdict against the will, and the court entered a decree accordingly.

The main contentions of the appellant, the proponent of the will, are (1) that the court erred in not granting her a peremptory instruction on the issue of mental capacity; and (2) that the court erred in overruling the appellant's motion for a new trial, particularly in that the verdict of the jury was against the overwhelming weight of the evidence.

Considering these assignments of error together, a statement of the material facts adduced on the trial is necessary.

The proponent did not rest upon a prima facie case made by offering all the record of the probate of the will in common; but as a part of her evidence in chief offered twenty-two witnesses to establish the mental capacity of the decedent on the day of the execution of the will.

On the day that he executed the will he conveyed by deed his real property to the proponent, Mrs. Fortenberry, and acknowledged it before a notary public.

By the terms of his will he provided for the payment of his debts and a monument at his grave. He bequeathed to his daughter, the contestant, $25, stating that he had made advancements to her, and incurred expenses in her behalf. And he then bequeathed the rest of his estate to the proponent, Mrs. Fortenberry.

On the date of the execution of the will there were present in the room his physician, Dr. Conner; Mr. Rawls, the lawyer who prepared the will; Mr. Aultman and Reverend Edward Yawn, the attesting witnesses; Tom Hartage, a notary public; and Mrs. Fortenberry, her husband, Ed Fortenberry, and their daughter, Eddie Rue.

Dr. Conner was not offered as a witness; the decedent's attorney, Rawls, offered, but the court sustained an objection to him as a witness.

The decedent was about eighty years of age when, on October 2, 1937, Mrs. Fortenberry brought him to her home, where he remained until his death; during which time Mrs. Fortenberry and her husband nursed and cared for him.

Aultman testified that he had known the decedent since 1915; that they were good friends; that he visited decedent upon his sending for him, and talked with him two or three hours, decedent telling him that he intended to make his home with the Fortenberrys, and wanted them to have his property—wanted a will drawn to that effect;

wanted to make a deed to them of his real property. Upon Aultman's suggestion that he would require the services of a lawyer—that the witness could not prepare a will—he suggested that Hollis Rawls be called in. After this visit Mr. Aultman, in the course of several days, was again sent for by the decedent, who wanted the will and deed attended to; and Aultman saw the lawyer and advised him of the decedent's wishes. Rawls prepared the will, and in the presence of the persons named above the decedent arose from his bed and listened to the reading of the will by Rawls. The lawyer had stated in the will that decedent's daughter was to receive $500; when he read that provision he was stopped by decedent, who said he did not want his daughter to have that much. The lawyer and Mrs. Fortenberry tried to persuade him to leave this provision unchanged, and upon his refusing to do so, substituted the sum of $25 for the $500. The will was again read to him, and he was satisfied with it. Hartage, the notary public, then held his hand and he made his X mark; whereupon the decedent called upon Aultman and Reverend Edward Yawn to act as subscribing witnesses, which they did. Aultman testified that he neither saw nor heard anything which would indicate that the decedent was not mentally capable of executing the will or transacting ordinary business. The deed was executed at the same time. The decedent told Aultman that the Fortenberrys had been good to him. There was nothing on that occasion to indicate that the decedent was under the influence of morphine, or was being unduly influenced by anyone.

The witness Reverend Edward Yawn, knew the decedent and frequently visited him in the Fortenberry home; in the course of their conversations the decedent quoted the Bible correctly, and was able to give book and verse. When the lawyer and proponent tried to persuade him to leave his daughter $500, he said, ''I am making this will—you all are not making it.'' The witness stated that decedent was aware of what he was doing, and that never

at any time, before or after the execution of the will, did he perceive that his mind was affected in any way.

The testimony of Aultman and Yawn in regard to the sanity and mental capacity of decedent to execute the will was fully corroborated by other witnesses, who asserted that there was nothing wrong with his mind. Eula Fortenberry, daughter of his half-sister, testified to intimate association with him, and stated that his mind was all right, that she and her mother had visited his home, and he in theirs; that she and her mother had cleaned his house for him before he came to live with them.

Reverend Zeb Polk testified that he had often visited decedent during his last illness, that he had known him for eight years, had talked with him about the Bible, and that he had a good and rational mind.

Reverend J. P. Holcomb, a Baptist minister, testified that he had known decedent about a year, had often seen him, and had visited him twice during his last illness, and talked with him at length, especially about spirtual matters, the Bible, his past life, and stated that, ''While talking with him I took him to be as rational considering his physical condition as any other man that is sick. He was a sane man—I took his mind to be allright—I don't think anything except he knew what he was talking.''

The testimony of the above witnesses was corroborated by ten or twelve others, whose acquaintance with the decedent ran back about forty-six years in some instances.

There was evidence to show that he declared his daughter cared nothing for him and had left him alone; that she ran away and married when she was thirteen or fourteen years of age; that she had forced him to settle with her for some cows which she claimed had belonged to her mother; and that she and her husband caused him trouble and expense about some of his bank deposit slips.

The effect of the evidence of a score of witnesses for the proponent was to show that there was no reason to consider that decedent lacked the mental capacity to execute a will, or to do whatever he might wish.

The evidence for the contestant, important to the decision, is now reviewed:

The witness, Archie Whitehead, 68 years of age, married the half-sister of decedent, whom he had known for about fifty years; lived five miles from the Wilkes home. The decedent came to his house on August 15, 1937, and remained there until October 2, 1937, being ill at the time. The witness had visited in the Wilkes home, which was in bad condition, certain signs in the house indicating that goats and chickens had been there during Wilkes' last days at home; his bed was dirty—decedent slept with "his shoes off and on." The "stuff" he ate had been cooked too long and was moulded. He had seen Wilkes go upon witness' front porch in the daytime and urinate without regard for ladies in the house or people passing in cars, although a slop jar was left in his room. Wilkes did not change his clothes; had a bad body odor, which he had known to cause persons to be "sick on their stomach;" never saw him bathe.

Barney Whitehead testified that decedent maintained an unsanitary house, and was personally dirty; was in the home of witness ill, from June 9, 1937, until August 15, 1937;—was not capable of attending to his own business, was suspicious that someone would harm him; was insane; would not settle with his tenants. The witness visited him at Fortenberry's twice, and did not find his mental condition improved.

Douglas, a tenant on decedent's place, testified that when he washed decedent's clothes the top of the water was covered with bedbugs. He said the decedent was suspicious; would not settle with him,—had Cavanaugh attend to that; for the last year or two was incapable of transacting business.

Hattox, another witness, testified that he saw him urinate on a public street in Columbia. Another witness, Roy Windham, testified that he had spent nights in decedent's home in 1935. His wife had been dead many years; decedent said that his dead wife came to his pas-

ture, and he "asked her out." The witness, Stringer, related an incident where the decedent told him he had in the bed a pistol with which a city marshal had killed a man but the witness saw the pistol, and the claim of decedent was false. The witness would not have risked having decedent attend to any business.

Most of the witnesses for contestant testified to the filthy condition of his home, his clothes and his person; his body odor was bad. Some of the witnesses claimed that he ran his terrace rows in the wrong direction; that he bragged, and exaggerated the number of his live stock —though it was admitted that they were good stock; he had a good home, barn and farm.

One witness said he indulged in foolish talk, had the mind of a young child on some subjects, and that of an old child on others; would switch from one subject to another. It developed that more than twenty-five years before the main incidents related, Wilkes' wife had deserted him and eloped with another man. Another witness said that decedent, while visiting in his home urinated on the floor in the presence of his wife and daughter, and upon being remonstrated with, said in effect that he would do that where he "damned please." On one occasion he was seen to eat meat with skippers in it. Twenty-two days after the will was executed the decedent failed to recognize a friend, and in explanation said he was "doped up" and crazy half the time.

It is evident that decedent suffered from some kidney trouble. No physician testified in the case. All the evidence shows that during the year 1937 decedent could not have occupied his house much of the time; and the same is true of the year 1936. The only two instances indicative of halucination testified to were in regard to his wife's appearing to him in the pasture, and the pistol episode, both of which seem to have been known only to the witness testifying. The record reveals no recurrence of such incidents.

On the question of a peremptory instruction the evi-

dence for contestant may be summed up as follows: The testator was an octogenarian, had been ill for months; his home was filthy; at times he ate food which was unfit for consumption; he did not bathe. He was suspicious, did not carry on a connected conversation, was jittery, talked like a child; on one occasion called in a neighbor to make a settlement with his two tenants involving resettlement checks; it was said that he did not properly terrace his land; was inclined to brag and exaggerate, told a falsehood one one occasion about the city marshal's pistol; thought he saw his dead wife in his pasture and ordered her way; persisted in practically disinheriting his daughter; urinated whereever he pleased, regardless of the presence of women.

About a dozen of the witnesses were of the opinion that his mind was not equal to the task of transacting his business.

1. It is true that no one of these actions, by itself, would be held to establish his mental incapacity, at the time he executed the will; but taken as a whole, we are of the opinion that although intrinsically weak, there was enough to avoid the scintilla rule, which is held not to be sufficient to raise an issue of fact as to his mental capacity. The peremptory instruction was properly refused, on the specific authority of Rena v. Wells, 175 Miss. 458, 167 So. 620.

We are convinced, however, that the court should have sustained the motion for a new trial on the ground that the verdict was against the overwhelming weight of the evidence.

The issue to be decided by the jury was only as to the mental capacity of the testator, and this is to be tested as of the date of the will. Scally v. Wardlaw, 123 Miss. 857, 86 So. 625.

The burden is on proponent to show such mental capacity. King v. Rowan, 82 Miss. 1, 34 So. 325. The yard stick for the measurement of the mental capacity of a testator has been thus stated: If at the time Wilkes exe-

cuted this will he understood and appreciated the nature of his act, the natural objects or persons to receive his bounty, and their relation to him; and was capable of reasoning and planning how he desired to bequeath his property, then he possessed the necessary testamentary capacity. Moore v. Parks, 122 Miss. 301, 84 So. 230. Non-expert witnesses are permitted to give opinions in regard to mental capacity when they have stated the facts and circumstances, the acts and declarations of the testator, upon which they finally based the opinion expressed. Ward v. Ward, 124 Miss. 697, 87 So. 153; Wood v. State, 58 Miss. 741.

Coexistent with the judicial history of this state has been the rule: "The attesting witnesses must not only witness the signing and publishing of the will by the testator, but it is also their duty to satisfy themselves that he is of sound and disposing mind and memory, and capable of executing a will. . . . For this reason, in the case of Brock v. Luckett's Ex'rs, 4 How. 459, this court said that the testimony of these subscribing witnesses is entitled to greater weight than the testimony of [witnesses] who had no such duty to perform, and especially is entitled to greater weight than the testimony of witnesses who were not present at the time of executing the will, and [especially is this true of those] who did not see the testator the day of its execution." Smith v. Young, 134 Miss. 738, 99 So. 370, 374, 35 A. L. R. 69; also Gillis v. Smith, 114 Miss. 665, 75 So. 451; Helm v. Sheeks, 116 Miss. 726, 77 So. 820.

The attesting witness to a will may express an opinion as an expert upon the testamentary capacity of the testator. Ward v. Ward, supra.

The proponent of the will in the case at bar made out her prima facie case; but not resting there, she established clearly and forcibly the mental capacity of the testator on the day of the execution of the will by two intelligent witnesses, whose clear, cogent and unequivocal testimony was unshaken by rigid cross-examination.

Likewise, the notary public who assisted the testator in signing his name had searched the old man's mind. None of the entire twenty witnesses saw any reason to doubt his mental capacity. These attesting witnesses had opportunity to observe him closely and critically as to his actions and speech during hours of conversation. He had his reasons for disinheriting his daughter, and was stubborn and self-willed in that action; he selected the lawyer whom he desired to prepare the will, called on the witnesses to subscribe thereto; and nothing that occurred on that day indicates a lack of understanding on his part. He had frequently declared his intention to take such action, and his reason therefor.

The strongest testimony in opposition is that of a witness who thought he was "jittery"—had the mind of a child; that two years before he had seen the ghost of his dead wife; and that in conversation he would switch from one subject to another. The ghost incident occured two years before. No other witness even hinted at that, or any other, hallucination at any time. Moreover, there was no sequence of events pointing to a progressive mental disability, in the glimpses of decedent's condition given by witnesses for the contestant. So far as the objectionable habits of decedent are concerned, they have little to do with the real issue here. As to his switching from one subject to another—that is nothing unusual; even lawyers at the bar get away from the thread of their argument and never return.

Even a confirmed liar has a right to make his will. An immoral man, who merits no respect from his fellows, has that right under our laws. None of the witnesses for the contestant recalled an unwise business deal, or fixed delusions or hallucinations. They had no special duty or reason to observe him. The greater part of their testimony is given to a recital of his objectionable habits, which are emphasized to the limit. They stated that his bed was infested with vermin, yet one or two of them slept with him. They said his meals were unsanitary

and revolting—yet at least two of them ate with him. They testified that he was indecent in attending to a call of nature (his kidneys), yet he was entirely welcome as a guest in their home.

In conclusion, the case is so strong for the proponent, and so weak for the contestant, that we feel it should be submitted to another jury. The most reasonable and convincing, as well as the overwhelming weight of the evidence upheld the validity of the will, since it overwhelmingly preponderated that the testator was mentally capable of executing it. See Lum v. Lasch, 93 Miss. 81, 46 So. 559.

2. Appellant insists that Hollis Rawls, the lawyer who wrote the will, was present at its execution, was a competent witness, and that there was no question of privilege, because others were present, and heard and saw what happened at that time, citing Nebhan v. Mansour, 162 Miss. 418, 139 So. 166, 878, in which is announced the rule in this state. We do not know what the answer of the witness was. He was examined out of the presence of the jury. Questions were asked him by counsel for proponent, seeking to elicit what he saw and heard on the occasion of the execution of the will. As each question was propounded it was objected to by counsel, and the objection was sustained by the court. An answer thereto was not insisted upon, nor did counsel state in the record what was expected to be proved by the witness. In this condition of the record we cannot reverse the case on that account. See Lizana v. Edward Motor Sales Co., 163 Miss. 266, 141 So. 295; Gulf, M. & N. R. Co. v. Willis, 171 Miss. 732, 157 So. 899, 158 So. 551.

Reversed and remanded.