454

Johnson, et al. *v.* Johnson, et al.

No. 39393 December 13, 1954 76 So. 2d 246

*H. C. Stringer,* Jackson, for appellants.

*Ernest Shelton, John C. Sullivan,* Jackson, for appellees.

McGEHEE, C. J.

This is a suit brought by the appellees to have set aside and cancelled three deeds of conveyance which were executed by Henry N. Johnson (now deceased) on July 19, 1948, October 12, 1948 and February 17, 1949, respectively, the first of which was in favor of one of the appellees, Irean Johnson Anderson, a daughter of the grantor by a former marriage, conveying twenty-five acres of land, the second of which was for 160 acres of land in favor of the appellant, Robert Johnson, a son by such former marriage, and the third of which was in favor of the appellee Ivory Johnson Gilmore, a daughter of such former marriage, conveying to her twenty

acres of land for life, with remainder to W. C. and H. C. Johnson, minor sons of the appellant Robert Johnson.

The complainants are Olivia Johnson, second wife of the grantor, Ruth Johnson Johnson, a daughter of the grantor and his second wife, and the said Irean Johnson Anderson and Ivory Johnson Gilmore, asking that all three of the deeds be set aside and cancelled on the ground of the alleged mental incapacity of the grantor to execute either of the said three deeds of conveyance, and on the ground of alleged undue influence on the part of Robert Johnson over the grantor in connection with the execution of at least the deed of conveyance in his own favor for the 160 acres of said land.

The bill of complaint alleges that the grantor, Henry N. Johnson, was above 80 years of age when the three deeds were executed, whereby he attempted to convey his 200 acres of land, located between the Towns of Bolton and Edwards in Hinds County; that the grantor and his second wife Olivia had moved from the 200-acre farm and took up their abode in a house located on a lot owned by them jointly in the City of Jackson, where they continued to reside until September 1946; that thereupon the grantor in the above mentioned deeds went back to his farm to live on the 200 acres of land where his son Robert Johnson was residing and cultivating a part of the land; that there was then filed a suit for separate maintenance on behalf of Olivia and in which proceeding she also sought a decree of divorce; that the decree of divorce was denied her but she was granted a decree for separate maintenance against the said grantor; that the grantor's son Robert Johnson had induced him to separate from his second wife Olivia and return to his farm in furtherance of an evil scheme to persuade the grantor to convey away his land for a grossly inadequate price; that the grantor was without mental capacity to execute a good and valid deed at the time of the execution of each of the three deeds in question; that there existed a confidential relation between

the grantor and his son Robert Johnson; that Robert had exercised undue influence over the grantor in procuring the execution of the deeds, and especially the one in his own favor; and that the same were executed without independent advice from anyone and at the instance of the grantee Robert Johnson.

A *guardian ad litem* was appointed for the minor defendants, and there was an answer filed which denied that the defendant Robert Johnson had in any manner influenced the grantor to leave his wife and return to his 200-acre farm, and the answer alleged that he had returned to his farm of his own accord and that it was not known by the defendants that he intended to do so until he arrived there and announced that he was at home to stay, and it is alleged that this was because of the attitude of his wife Olivia toward him.

The answer admitted that the grantor had a strong affection for his son Robert, and that this affection was mutual, but the answer denied that the son Robert had attended to all of the business affairs of the grantor after his return to the farm, and alleged that "At no time did his son take any kind, type or form of undue advantage" of the grantor in connection with the execution of either of the three deeds of conveyance. Other material allegations of the bill of complaint were also denied in a manner sufficient not to constitute the answer an admission of the material allegations of the bill of complaint. We have carefully examined all of the allegations of the bill and the averments of the answer, and we are unable to agree that the answer admitted the facts alleged, and essential to be shown, to render the deeds invalid on the ground of mental incapacity or undue influence.

The complainants then amended their bill of complaint so as to allege that the deeds were invalid for nonjoinder of the wife, Olivia Johnson, in the execution thereof on the ground that the 200-acre farm to which the grantor had returned in September 1946 was the homestead of

the grantor and his wife at the time of the execution of the three deeds of conveyance. The proof disclosed that from September 1946, when the grantor returned to his farm, until his death on January 1, 1951, his wife Olivia remained in their house in Jackson, and claimed homestead exemption benefits each of said years on the house and lot in the City of Jackson. It is true that the husband has the right to select the homestead, and that the wife was entitled to live there with him, in the absence of a divorce or other sufficient cause, from September 1946 until the date of his death on January 1, 1951; but for some reason she did not do so, and claimed her homestead on their joint property in the City of Jackson. Section 330, Code of 1942, provides, among other things, that: "A conveyance, mortgage, deed of trust or other incumbrance upon the homestead exempted from execution shall not be valid or binding unless signed by the wife of the owner if he be married *and living with his wife.*" (Italics ours).

- On the issue of the lack of mental capacity to execute the deeds of conveyance, and on the issue of whether or not the same were executed as a result of fraud and undue influence exerted by the grantee, Robert Johnson, on the grantor, Henry N. Johnson, the question arises as to whether or not under the decision in the case of Lambert, et al v. Powell, et al, 199 Miss. 397, 24 So. 2d 773, and other decisions of this Court, the evidence is sufficient to justify the setting aside and cancellation of either of the three deeds in question.

 In his opinion in the case at bar, the chancellor stated: "There are strong allegations of fraud set forth in the Bill of Complaint but there is no evidence before this Court to sustain such allegations. There are repeated allegations of undue influence having been practiced by the son, Robert Johnson, upon his father, Henry N. Johnson, in an effort to have the father convey to the son title to certain of the property in question. There is little or no evidence before the Court to sustain these

allegations." For the reason hereinafter to be stated, we are unable to say from the testimony in this record that the chancellor was manifestly wrong in so finding. In fact, we agree with his finding on the issue of fraud and undue influence.

This brings us to a consideration of the testimony as to whether or not the proof is sufficient to justify the finding of the trial court that the deeds in question should be set aside and cancelled because of alleged mental incapacity on the part of the grantor at the time he executed the deeds to make a good and valid deed of conveyance.

The proof on behalf of the complainants is, in substance, as follows: A witness, Joe T. Dehmer, testified that he had known the grantor since 1940 or 1941; that he knew the grantor in 1945 and 1946, prior to the time the latter moved out into the country with his son, Robert; that he saw him irregularly every sixty or ninety days before he went back to his farm; that he, the witness, had a certain lease on gravel deposits on the land which he acquired in 1939; that the grantor came to the office of the witness at least one time after he moved back to the farm, but he did not state at what time this occurred; that the grantor "was showing definite signs of senility; that physically he was getting, two or three years before he left Jackson, deteriorating physically and mentally. He was definitely not rational." The witness further stated that "I would say that he was incoherent in his speech, and I would say that he was becoming definitely irrational at that time." The witness was further asked: "Q. From the time you first knew him about 1940 or 1941, I believe you said, up until the time you last saw him, would you say that his mental condition improved or was on the decline throughout that period. A. Definite decline, just a gradual definite pattern of decline. My surmise would be that it was principally senility. It might be more than that."

On cross-examination, he was asked: ''Q. When you said the last time you saw him he was incoherent. A. That is correct. Q. When was that; in 1945? A. That was for especially the last two years before he left Jackson. Q. He left Jackson in 1946. That would be 1944 and 1945, wouldn't it? A. That's right, if he left Jackson in 1946. Q. What do you mean when you say a person is senile? A. Well, I mean age is a factor in his physical and mental capabilities.'' The witness was then asked ''Q. I want to get you right down to the point here, now. On July 19, 1948, he sold some land to Irene (Irean), his daughter. That was on the 19th of July, 1948. What would you tell this court of your own personal knowledge of the mental capacity of old Uncle Henry Johnson at that time to make this deed? A. I can't tell the court anything * * *. Q. All right? A. * * * because I hadn't seen him at that particular interval for about two years. Q. On October 12, 1948, he sold some more of his land to Robert Johnson, October 12, 1948. On October 12, 1948, the day he made this deed to Robert, what can you tell the court of your own personal knowledge about his mental capacity to transact business at that time, of your own personal knowledge now? A. Well, we will make it clear in this respect, I saw him * * * .'' Then the witness further stated ''* * * 1946. I saw him one time after that, about a year after that. * * * Q. 1948. Just say what you know. A. Well, if I can't testify as to information that was received by me through his kin people, why, I can say definitely that I didn't see the man. Q. That is all right. A. * * * after the first part of 1947. Q. That is all right. I will ask you this question: It is again appearing in this record that on February 17, 1949, he sold Ivory Gilmore, another daughter of his, some acreage. Tell the court what you know, if anything, about his mental condition on February 17, 1949, when he sold his daughter this acreage, what you know of your own personal knowledge about

his mental capacity to transact business. A. I didn't see Henry after the first month of 1947.''

Another witness, Mrs. E. E. Burnham, an unlicensed nurse, testified that Ivory Johnson Gilmore, a daughter of the grantor, was cooking for the witness, and that she would carry Ivory out to the farm to see her father, beginning in 1947. ''Q. That is during the period of 1947 up until the time of his death? A. '47, '48, and '49.'' This witness stated that on her visits to the farm of the grantor, she would sometime be there one, two or three hours; that she would see the grantor and that ''he would be sitting in the yard. If it was in the fall of the year, he would be sitting in the sun. In summer he would sit in the shade.'' She was further asked: ''Did you talk with him any, Mrs. Burnham? A. I did. Q. Did you observe him? A. Well, from what I—from his conversation, I would say he was a senile person. He was childish. He had more or less the mind of a child. Q. I will ask you whether or not his condition changed any. A. I believe along toward the last—he didn't seem to have any interest in anything, you know. You would just have to make conversation with him.'' This witness further stated that ''he might have been a little weaker along toward the last, but he was more or less what you find in any 80-year old man.'' When asked whether he was capable of transacting business on any of her visits there, the witness states: ''I would say he wasn't. Q. That is your opinion. A. That is my opinion. That is just my opinion, that I wouldn't think a man of his age would be, you know, mentally or, you know, able to take care of business.'' This witness further stated, ''He was more or less senile, what you would call a senile person that didn't have, didn't seem to have any, business—you know what I mean—that would be able to transact business.'' And this witness further stated that he would talk about his daughter, Ruth. It seems that the grantor objected to his daughter Ruth marrying the man she married, and that her

mother, Olivia, was in favor of the marriage. This witness was further asked whether or not the mental condition of the grantor grew worse, and she answered, "Well, he seemed to be about the same. He wasn't interested any more when I first went down there in things than he was at the last. He just didn't seem to be interested in things."

The witness, Mrs. Burnham, was further asked the question whether she knew anything about the mental capacity of the grantor on the 19th of July 1948 at the time he sold his daughter some land, and she answered, "I wasn't there when he sold the land and I wasn't there when he signed the deeds. Q. You couldn't tell this court whether he was capable at that time or not, could you? A. I saw him * * * Q. Well, listen, answer my question. A. I wasn't there. I couldn't tell you." She further stated, "I wasn't there at that time, at the time he made out the deeds. The times when I saw him, I only observed from those and the visits I made down there, that he was more of a senile person at the age of eighty years where you have hardening of the arteries and are not responsible for transacting business. * * * Q. Would you tell this court as a matter of fact, of your own personal knowledge, that on October 12, 1948, when he sold his son, Robert, some land that he was insane and not capable of transacting business? A. I was not out there. Q. All right. On February 17, 1949, he sold his daughter some land. Would you tell this court that at that time he was insane and didn't know what he was doing? A. I wasn't out there when these business deals were transacted."

It should be noted here that the two witnesses, the substance of whose testimony is hereinbefore quoted, and who were testifying as lay witnesses, were not asked to state, and did not mention, any incident, or the sayings or doings of the grantor, sufficient to indicate that he was of unsound mind, on which they were basing an opinion as to his mental capacity. In other words, they

didn't qualify to give an opinion. However, their testimony was not objected to on that ground and we are considering the same for whatever probative value it may have on the issue of mental capacity.

Another witness for the complainants was Lillie Mae Tobias, who lived near the grantor and his wife Olivia in the City of Jackson during the years 1944, 1945 and 1946. It seems that she did not see the grantor after 1946 except on one occasion when he came to Jackson to see his wife, Olivia, when she was sick. Her testimony was in substance that the grantor was then senile, and talked as if he just had the mind of a child. She was asked on cross-examination: "Q. All right. What do you know about Uncle Henry N. Johnson's mental condition on October 12, 1948. Was he sane or insane?" She made no answer to this question. "Q. You can't answer that, can you?" She still made no answer. She was then asked, "What do you know about his capacity to transact business on October 12, 1948?" She made no answer to this question. "Q. You don't know anything, do you?" She made no answer to this question. Finally she was asked, "Do you know, Lillie Mae, what his condition was in 1948? A. No, sir. Q. All right. On February 17, 1949, what do you know as to his mental condition on that date. Could he transact business on that date or not? A. I don't know, sir."

Garrett Anderson, another witness for the complainants, was asked about the mental condition of the grantor in 1945 and 1946 and he said, "Well, along in that time he had got kind of childish like. Sometimes he would know what he was talking about, and then again he would go on off and wouldn't know what he was talking about." In other words, according to the testimony of this witness he had lucid intervals; that sometime the grantor wouldn't know him, and he would talk about one thing two or three minutes and then begin talking about something else. That he went out to see the grantor at his farm on two occasions after 1946 but

only saw him there one time, but saw him another time when he came to visit his wife, Olivia, in Jackson when she was sick; that he was sitting by her bed and said, "Well, I am going out in the yard to catch some air;" that the last time he saw him he asked him, "What about your business? Time you are getting all that fixed up, ain't it? You are talking about going out of this world." And that the grantor said, "I have got 200 acres of land I left here for my children. They ought to live off of that," and that the grantor then began talking about something else. Finally he said that the grantor got confused as to the location of the house in Jackson when he came to see his sick wife. The witness didn't think that the grantor was capable of transacting business at that time, and that the occasion referred to may have been in January 1948, which would have been several months prior to the execution of the deeds in question. He said that he did not see him in October 1948, which was the month during which he executed the deed for the 160 acres to his son, Robert.

These were all of the witnesses introduced by the complainants, and as stated by the chancellor in his opinion, "There is no evidence before this court by any witness who was present at the time and place these instruments were executed to say that the deceased, Henry N. Johnson, was or was not in possession of sound and disposing mind and memory on such occasion." The chancellor found, however, that the said grantor "was at an age in life, at the time of the execution of these deeds, when he could be very easily influenced one way or another and would little realize what he was doing in the way of conveying interest which he might have in real estate." But as hereinbefore stated he had found elsewhere in his opinion that there was no evidence before the court to support the allegations of fraud or undue influence. After the testimony of the four witnesses hereinbefore discussed had been introduced the complain-

ants introduced the separate maintenance and divorce proceedings, and then rested the case.

Neither of the complainants nor any of the defendants were offered as witnesses to testify, since they were disqualified under Section 1690, Code of 1942, to establish their claim against the (alleged) estate of a deceased person; but the defendants introduced as witnesses Lee Donaldson, a neighbor of the grantor, who had known him for thirty years immediately prior to his death, and who had seen him at least once every week prior to his death, and Lorene Johnson, wife of the defendant Robert Johnson, and their two unmarried daughters, Earlean and Maryland Johnson, as well as Robert Byrd, who had known the grantor for at least sixty years and up until the time of his death, and they testified to establish the mental capacity of the grantor during the last four or more years of his life.

The testimony of Lee Donaldson was to the effect that he had never observed anything mentally wrong with the grantor; that the grantor had been a Baptist minister for about fifty years; that he, the witness, would frequently have the grantor write letters for him and that he would read them back correctly in the words in which the witness had requested that they be written, and that the last of these letters was written about a month before the grantor died; that the grantor was capable of transacting business and did transact his own business up to the time of his death.

Lorene Johnson testified that the grantor lived in her home from September 1946 until his death on January 1, 1951, and that he was of sound mind throughout the year in which he executed the deeds in question, and until his death; that he would advise with her as to how to raise her children; that there was nothing wrong with him mentally; and that he was all right physically except that he had a bad rupture and was about 84 years old at the time of his death, which would have made him about 82 years of age when the three deeds in question

were executed; that he attended to his own business except on some occasions when he would ask Robert to attend to some business for him and would then give Robert instructions as to how to transact the same; that Robert would pay his taxes when his father did not pay them himself; that Robert had nothing to do with the matter of the grantor leaving his wife in Jackson and returning to his farm, and that she and Robert did not know that he was coming back to the farm until he arrived and announced that he had come there to stay; that he paid his bills by cash and by checks on his bank account at Edwards, and was fully capable of knowing what he was doing during the year he executed the three deeds of conveyance in question.

Earlean Johnson testified that her grandfather's mind was not impaired at all; that he mentioned to her that he was going to make some deeds to convey his land; that he wrote checks on his bank account without assistance; that her father, Robert, did not influence him to leave his wife in Jackson and come back to the farm, and did not attend to the business of the grantor for him; and that shortly before his death the grantor wrote a check in payment for some plumbing work which had been done in installing certain fixtures in his house at Jackson, and that he wrote checks on his bank account all along until he died. She was corroborated by the testimony of her sister Maryland Johnson who was seventeen years of age, and both of whom had resided in the home for the last four years or more of the life of the said grantor.

Robert Byrd testified that the grantor had attended to all of his business up to the time of his death and that he was fully capable of transacting his business, even though he was an old man.

In other words, the only testimony in the record as to the mental capacity of the grantor at along about the time these deeds were executed was to the effect that

he was mentally capable of executing good and valid deeds of conveyance.

The notary public who took the acknowledgments to the three deeds of conveyance was not introduced by the complainants as a witness. However, it does not appear from the record as to whether or not he was available. There is no proof that any of the grantees were present on the occasion of the execution of either of the three deeds, or that anyone had undertaken to influence the grantor to execute them. Moreover, employees of the Bank and other businessmen at Edwards should have been able to throw some light on the question at issue. The burden of proof was on the complainants in that regard. As will appear from the respective dates of the deeds, he had already conveyed 20 acres of land to one of his daughters prior to the execution of the deed to the 160 acres to his son Robert, and it is shown that he told his daughter that he was conveying the land to her with the idea of building her a home thereon in order that he could live with her part of the time and with Robert the remainder of the time. Then, too, in executing the deed for the 160 acres to his son Robert, he retained 20 acres which he later undertook to convey to another daughter for life, with the remainder to his two grandsons. It is true that this deed described some of the land theretofore conveyed to the son of the grantor, but whether this was the mistake of the grantor or of the draftsman of the later deed does not appear.

In the case of Lambert, et al. v. Powell, et al., supra, it was held that the mental capacity of one executing an instrument to pass a title to land is to be tested as of the date of its execution, and that even temporary or intermittent insanity or mental incapacity does not raise a presumption that it continued to the date of such execution. Alexander on Wills, Vol. 1, p. 327; Schouler on Wills, Vol. 1, p. 134; Lum v. Lasch, 93 Miss. 81, 46 So. 559; Moore, et al v. Parks, et al, 122 Miss.

301, 84 So. 230; Scally, et al v. Wardlaw, et al, 123 Miss. 857, 86 So. 625; and Fortenberry v. Herrington, 188 Miss. 735, 196 So. 232.

In the case of Gillis, et al v. Smith, et al, 114 Miss. 665, 75 So. 451, the Court said, "no one of the witnesses referred to was present at the time the deed was executed, and no living witness undertakes to state what the physical or mental condition of the grantor was on the day the deed was executed, except witness for the defendant whose testimony we now proceed to detail." And in the case of Lambert v. Powell, supra, the Court in referring to the above quoted language stated: "The Court evidently intended by this observation to hold that the time for testing the mental capacity for a grantor to make a deed was the same as that for testing such capacity of a testator to make a will."

 In the case of Fortenberry v. Herrington, supra, the testimony on behalf of the appellees made a much stronger case for setting aside a will on the ground of mental incapacity than that made by the testimony in the case at bar. There the Court reversed and remanded for a new trial a decree based upon the verdict of the jury which had found that the testator was without mental capacity to make the deed. However, that reversal was based upon the weight of the evidence. But in the case of Lambert, et al v. Powell, et al, supra, where the proof was likewise much stronger than that presented in the case at bar in behalf of mental incapacity, **the Court reversed the case and** rendered a decree here for the appellants, saying, among other things, that "the burden was on the complainants to prove that he was mentally incapacitated to make a deed on January 24, 1942, * * *." A careful reading of the entire opinion in that case will disclose that the complainants in the instant case have failed to meet the burden of proof of showing that the grantor, Henry N. Johnson, did not possess mental capacity to execute a good and valid deed either on July 19, 1948, October 12, 1948, or

February 17, 1949, and that the decree of the court be-
low as to each of the deeds should have been in favor
of their validity.

Reversed and judgment here for the appellants.

*Lee, Holmes, Arrington* and *Ethridge, JJ.,* concur.